FRANKLIN B. BIGGS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7272–75.    Filed March 13, 1978.

*Joshua W. Miles* and *Louis F. Friedman,* for the petitioner.
*Robert E. Dallman,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency of $5,261.42 in the petitioner's Federal income tax for 1969. The sole issue remaining for decision is whether the petitioner's transfer of real property situated in Maryland and receipt of real property situated in Virginia constituted an exchange within the meaning of section 1031 of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Franklin B. Biggs, maintained his legal residence in Florida at the time he filed his petition in this case. He filed his Federal income tax return for 1969 with the District Director of Internal Revenue, Wilmington, Del.

On, and for some years before, October 23, 1968, the petitioner owned in fee simple two parcels of land located in St. Martin's Neck, Worcester County, Md. (the Maryland property). Sometime before October 23, 1968, the Maryland property was listed for sale with a realtor. The realtor informed Mr. Biggs that he had a client, Shepard G. Powell, who was interested in acquiring the property.

On October 23, 1968, Mr. Biggs and Mr. Powell met and discussed the possible acquisition of the Maryland property by Mr. Powell. At the outset of the discussion, Mr. Biggs informed

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during the year at issue.

Mr. Powell that as part of the consideration for the transfer of the Maryland property to Mr. Powell or his assigns, Mr. Biggs insisted that he receive real property of like kind. It was understood that Mr. Biggs would locate the property to be received in exchange, and Mr. Powell agreed to cooperate in the arrangements for an exchange, as long as it was not harmful to him.

On October 25, 1968, Mr. Biggs[2] and Mr. Powell executed a written memorandum of intent with respect to the sale of the Maryland property to Mr. Powell. Such memorandum provided in relevant part:

### MEMORANDUM OF INTENT

I. PURCHASE PRICE: $900,000 *NET* to SELLERS.

\*　　\*　　\*　　\*　　\*　　\*　　\*

c. $25,000.00 down payment at signing of contract, * * *

d. $75,000.00 additional payment at time of settlement, which shall be within ninety (90) days after contract signing, making total cash payments of $100,000.00.

II. MORTGAGE:

a. Balance of $800,000.00 secured by a first mortgage on Real Estate to SELLERS at a 4% interest rate; 10 year term.

\*　　\*　　\*　　\*　　\*　　\*　　\*

The memorandum of intent contained no reference to any proposed exchange of properties.

Sometime between October 20 and October 24, 1968, Mr. Biggs consulted his attorney, W. Edgar Porter, concerning the proposed transfer of the Maryland property to Mr. Powell. Subsequently, Mr. Porter reviewed the memorandum of intent which had been executed by the parties; he advised Mr. Biggs that such memorandum was not in accordance with the proposed transaction as it had been described by Mr. Biggs, in that there was no reference to a proposed exchange of properties. Mr. Porter also advised Mr. Powell by telephone that the memorandum of intent did not comport with Mr. Porter's understanding of the proposed transaction. Mr. Powell agreed to have his attorney work out the terms of a written exchange agreement with Mr. Porter.

After his conversation with Mr. Powell, Mr. Porter advised

---

[2] Mr. Biggs' wife, Juditha Biggs, also signed such memorandum and executed certain other documents necessary to effectuate the transactions at issue.

Mr. Biggs that he could begin looking for suitable property to be received in exchange for the Maryland property. To this end, Mr. Biggs advised John Thatcher, a Maryland realtor, of his desire to locate real property which was of substantial value and which was similar in nature to the Maryland property. Subsequently, Mr. Biggs was contacted by Johna H. Davis, a real estate broker, who had in his inventory four parcels of land situated in Accomack County, Va., collectively known as Myrtle Grove Farm (the Virginia property), which appeared to satisfy Mr. Biggs' specifications. After viewing the Virginia property, Mr. Biggs instructed Mr. Davis to draft contracts of sale.

Mr. Porter reviewed the proposed contracts prior to their execution and advised Mr. Davis that they should be drawn so as to indicate that Mr. Biggs was acting as an agent for a syndicate; before their execution by Mr. Biggs, the contracts were modified to describe the purchaser as "Franklin B. Biggs, (acting as agent for syndicate)." On October 29 and 30, 1968, the four land sales contracts were executed; the terms of such contracts were as follows:

| | |
|---|---:|
| Paid on execution of contract | $13,900.00 |
| Balance due at settlement | 115,655.14 |
| Indebtedness created or assumed | 142,544.86 |
| Total—gross sales price | 272,100.00 |

At the time such contracts were signed, Mr. Biggs paid $13,900 to the sellers of the Virginia property.

Mr. Powell was either unable or unwilling to take title to the Virginia property. Mr. Biggs therefore arranged to have title transferred to Shore Title Co., Inc. (Shore), a Maryland corporation owned and controlled by Mr. Porter and his family. However, it was not until December 26, 1968, that the board of directors of Shore authorized it to take title to the Virginia property.

On January 9, 1969, prior to the transfer of the Virginia property to Shore, Mr. Biggs and Shore executed an agreement with respect to the Virginia property, which provided in relevant part:

1. At any time hereafter that either party hereto requests the other party to do so, Shore Title Co., Inc. will and hereby agrees to convey unto the said Franklin B. Biggs, or his nominee, all of the above mentioned property, for exactly the same price said Shore Title Co., Inc. has paid for it, plus any and all

costs, expenses, advances or payments which Shore Title Co., Inc. has paid or will be bound in the future to pay, over and above said purchase price to Shore Title Co., Inc., in order for Shore Title Co., Inc. to acquire or hold title to said property; and it [is] further agreed that at that time, i.e.—when Shore Title Co., Inc. conveys said property under this paragraph and its provisions, the said Franklin B. Biggs., or his nominee will simultaneously release or cause Shore Title Co., Inc. to be released from any and all obligations which the latter has created, assumed or become bound upon in its acquisition and holding of title to said property.

2. All costs for acquiring or holding title to said property by both the said Shore Title Co., Inc. and Franklin B. Biggs, or his nominee shall be paid by the said Franklin B. Biggs, or his nominee at the time of transfer of title under paragraph numbered 1 hereof.

On or about January 9, 1969, the contracts for the sale of the Virginia property were closed; pursuant to a direction by Mr. Biggs, the sellers delivered warranty deeds evidencing legal title to the property to Shore. The $115,655.14 balance due at settlement was advanced to Shore by Mr. Biggs; by a bond secured by a deed of trust on the property, Shore agreed to repay the same amount to Mr. Biggs. Shore also assumed liabilities of $142,544.86 which were secured by deeds of trust in favor of the sellers and another mortgagee. On January 13, 1969, Mr. Biggs paid a finder's fee of $3,026 to Mr. Thatcher; Mr. Biggs also paid all of the closing costs incident to Shore's acquisition of the Virginia property.

On February 26, 1969, Shore, as vendor, entered into an agreement of sale with Mr. Powell or his assigns, vendee, for the sale and purchase of the Virginia property. The agreement provided for the payment of the purchase price as follows:

Upon execution of the agreement ......................... $100.00
Vendee assumed and convenanted to
  pay the following promissory notes,
  all secured by deeds of trust on
  the Virginia property:
    To Shore Savings & Loan Association ...............58,469.86
    To those from whom Shore acquired
      the Virginia property......................................84,075.00
    To Franklin B. Biggs .................................... 115,655.14
Balance due at settlement .................................13,900.00
  Total purchase price ..................................... 272,200.00

On February 27, 1969, Mr. Biggs, as seller, and Mr. Powell or

assigns, as purchaser, entered into a contract of sale for the Maryland property. The terms of such contract were as follows:

| | |
|---|---|
| Cash, upon execution | $25,000 |
| Cash, at settlement | 75,000 |
| First mortgage note receivable from Mr. Powell | 800,00 |
| Total | 900,000 |

Such contract further provided:

Sellers and Purchaser acknowledge the existence of a Contract of Sale dated February 26th, 1969, between Shore Title Co., Inc., Vendor-Seller, and Shepard G. Powell or Assigns, Vendee-Purchaser, copy of which is attached hereto and made a part hereof, whereby that Vendor has contracted to sell and that Vendee has agreed to buy from that Vendor at and for the purchase price of Two Hundred Seventy Two Thousand Two Hundred Dollars ($272,200.00) * * * [the Virginia property]. *As a further consideration for the making of this Contract of Sale * * * for the sale and purchase * * * of * * * [the Maryland property] the said Shepard G. Powell or Assigns, for the sum of One Hundred Dollars ($100.00) in cash, in hand paid, receipt whereof is hereby acknowledged, does hereby bargain, sell, set over and transfer unto said Franklin B. Biggs all of the right, title and interest of the said Shepard G. Powell or Assigns in and to said Virginia property and said Contract of Sale relating thereto, upon condition that the said Franklin B. Biggs assumes and convenants to pay (which he hereby does) all of the obligations assumed by the said Shepard G. Powell under the aforesaid Contract of Sale between him and Shore Title Co., Inc.; and said Franklin B. Biggs hereby agrees to hold Shepard G. Powell or Assigns harmless from any liability under any and all of said obligations on said Virginia property,* and the said Shepard G. Powell and said Franklin B. Biggs do hereby jointly and separately agree to execute and deliver any and all necessary papers to effect delivery of title to said Virginia property to said Franklin B. Biggs and to relieve said Shepard G. Powell from any and all obligations assumed by him thereon. [Emphasis supplied.]

Also on February 27, 1969, Mr. Powell and his wife assigned their contractual right to acquire the Maryland property to Samuel Lessans and Maurice Lessans. By an agreement of sale and assignment, dated May 22, 1969, the Lessans[3] sold and assigned their rights to acquire the Maryland property to Ocean View Corp. (Ocean View), a Maryland corporation, for $1,300,000. Of the total purchase price, $150,000 was to be paid into escrow at the time such contract was signed; an $800,000 note (executed by Ocean View in favor of Mr. Biggs) was to be

---

[3]Belle Lessans, the wife of Samuel Lessans, and Gertrude Lessans, the wife of Maurice Lessans, joined in executing such agreement of sale and assignment.

given to Mr. Biggs at settlement; a $250,000 note (executed by Ocean View in favor of the Lessans) was to be given to the Lessans at settlement; and a $100,000 note (executed by Ocean View in favor of the realtors) was to be given to the realtors at settlement.

Ocean View was incorporated on May 21, 1969. At the first meeting of the board of directors, held May 22, 1969, the directors authorized the corporation to execute all documents necessary to consummate the contract of sale assigned by the Lessans to Ocean View. The minutes of such first meeting reveal that it was:

FURTHER RESOLVED: That the proper officers of this Corporation are hereby authorized and empowered to quit claim any of the Corporation's interest in the tract of land located in the State of Virginia referred to in the said contract of sale;

However, neither the Lessans nor Ocean View had any option, contract, or obligation to purchase the Virginia property, or any other interest in such property.

On May 24, 1969, Shore executed a deed conveying all its right, title, and interest in the Virginia property to Mr. Biggs as grantee. Mr. Powell and his wife, the Lessans, and Ocean View joined in executing the deed as grantors. The deed provided that:

the said Shore Title Co., Inc., a Maryland corporation, executes this deed to the Grantee herein for the purpose of conveying the * * * Virginia property hereinafter described by good and marketable title, subject to the assumption by the Grantee herein of the obligations hereinafter referred to, *and all of the other Grantors herein join in the execution of this deed for the purpose of releasing and quit-claiming any interest in and to the property described herein and for the purpose of thereby requesting Shore Title Co., Inc. to convey said property to the Grantee herein in the manner herein set out;* [Emphasis supplied.]

Ocean View signed the deed upon the advice of its attorney, who, although he believed that Ocean View had no interest in the Virginia property, did not object because Ocean View was signing only a quitclaim deed involving no warranties. By the same deed, Mr. Biggs agreed to assume and pay the notes in favor of the mortgagee and the owners from whom Shore had acquired the Virginia property, in the total amount of $142,544.86. On May 29, 1969, Mr. Biggs executed a deed of

release in favor of Shore, evidencing payment in full of the bond dated January 10, 1969, in the amount of $115,655.14.

On May 26, 1969, Mr. Biggs and his wife, Mr. Powell and his wife, and the Lessans executed a deed conveying title to the Maryland property to Ocean View. Contemporaneously, Ocean View executed a purchase money obligation secured by a mortgage, in the face amount of $800,000, in favor of Mr. Biggs. Also on May 26, 1969, all of the contracts were closed; Ocean View received the deed to the Maryland property, and Mr. Biggs received the deed to the Virginia property.

On his 1969 Federal income tax return, Mr. Biggs reported his gain from the sale of the Maryland property as follows:[4]

| | | |
|---|---:|---:|
| Selling price of Maryland property | $900,000.00 | 100.00% |
| Exchange—Virginia property | [a]298,380.75 | 33.15% |
| Boot | 601,619.25 | 66.85% |
| Selling price Maryland property | 900,000.00 | |
| Basis—date of exchange | 186,312.80 | |
| Gain | 713,687.20 | |
| Not recognized—exchange (sec. 1031 I.R.C.)—33.15% | 236,587.31 | |
| Taxable gain | 477,099.89 | 53.011% |

[a]Such figure included finders' fees and legal costs incident to the acquisition of the Virginia property.

Mr. Biggs elected to report the sale under the installment sales provisions of section 453. In his notice of deficiency, the Commissioner determined that there was not an exchange of like kind properties within the meaning of section 1031; accordingly, the gain to be recognized was increased to $713,687.20, the difference between the gross sales price of the Maryland property and its adjusted basis.

OPINION

Section 1031(a) provides that no gain or loss shall be recognized if property held for productive use in a trade or business or for investment is exchanged solely for property of a like kind. If money or other property not of a like kind—or "boot"—is also received in an exchange, gain is recognized to the

[4]Mr. Biggs has conceded that, if we find that the transaction qualified under sec. 1031, the method he used to calculate the gain to be recognized was in error.

extent of the boot. Sec. 1031(b). The purpose of section 1031 (and its predecessors) was to defer recognition of gain or loss on transactions in which, although in theory the taxpayer may have realized a gain or loss, his economic situation is in substance the same after, as it was before, the transaction. Stated otherwise, if the taxpayer's money continues to be invested in the same kind of property, gain or loss should not be recognized. H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 564; *Jordan Marsh Co. v. Commissioner*, 269 F.2d 453, 455–456 (2d Cir. 1959), revg. a Memorandum Opinion of this Court; cf. *Century Electric Co. v. Commissioner*, 192 F.2d 155, 159 (8th Cir. 1951), affg. 15 T.C. 581 (1950), cert. denied 342 U.S. 954 (1952).

The transaction involved in the case before us is a variant of the so-called "three-corner" exchange. In such a transaction, the taxpayer desires to exchange, rather than to sell, his property. However, the potential buyer of the taxpayer's property owns no property the taxpayer wishes to receive in exchange. Therefore, the buyer purchases other suitable property from a third party and then exchanges it for the property held by the taxpayer.

In numerous cases, this type of transaction has been held to constitute an exchange within the meaning of section 1031. E.g., *Alderson v. Commissioner*, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962); *W. D. Haden Co. v. Commissioner*, 165 F.2d 588 (5th Cir. 1948), affg. on this issue a Memorandum Opinion of this Court; *Coupe v. Commissioner*, 52 T.C. 394 (1969); *J. H. Baird Publishing Co. v. Commissioner*, 39 T.C. 608 (1962); *Mercantile Trust Co. of Baltimore et al., Trustees v. Commissioner*, 32 B.T.A. 82 (1935). In so holding, the courts have permitted taxpayers great latitude in structuring transactions. Thus, it is immaterial that the exchange was motivated by a wish to reduce taxes. *Mercantile Trust Co. of Baltimore et al., Trustees v. Commissioner, supra* at 87. The taxpayer can locate suitable property to be received in exchange and can enter into negotiations for the acquisition of such property. *Coastal Terminals, Inc. v. United States*, 320 F.2d 333, 338 (4th Cir. 1963); *Alderson v. Commissioner*, 317 F.2d at 793; *Coupe v. Commissioner*, 52 T.C. at 397–398. Moreover, the taxpayer can oversee improvements on the land to be acquired (*J. H. Baird Publishing Co. v. Commissioner*, 39 T.C. at 611) and can even advance money toward the purchase price of the property to be

acquired by exchange (*124 Front Street, Inc. v. Commissioner*, 65 T.C. 6, 15–18 (1975)). Provided the final result is an exchange of property for other property of a like kind, the transaction will qualify under section 1031.

Despite the liberal treatment previously accorded taxpayers by the courts, the Commissioner asks us to hold that the petitioner's transfer of the Maryland property and receipt of the Virginia property did not constitute an exchange within the meaning of section 1031. The Commissioner argues that there was no contractual interdependence between the transfer of the Maryland property and the receipt of the Virginia property. He asks us to view what transpired as two separate transactions: a sale for cash of the Maryland property, and a separate and unrelated purchase of the Virginia property. The Commissioner stresses the form in which the transaction was cast. He asserts that the fact that the petitioner advanced funds to be used by Shore in its acquisition of the Virginia property, coupled with the fact that Mr. Powell, the Lessans, and Ocean View never acquired legal title to the Virginia property from Shore, preclude a finding that the transaction constituted an exchange.

The starting point of our analysis is the well established principle that the substance of a transaction, rather than the form in which it is cast, ordinarily determines its tax consequences. E.g., *Smith v. Commissioner*, 537 F.2d 972, 975 (8th Cir. 1976), affg. a Memorandum Opinion of this Court; *J. H. Baird Publishing Co. v. Commissioner*, 39 T.C. at 615–616. If, in substance, what occurred was a sale of the petitioner's Maryland property for cash, and a separate and unrelated purchase of the Virginia property, then the Commissioner's determination must be sustained. On the other hand, if the petitioner's transfer of the Maryland property and receipt of the Virginia property were interdependent parts of an overall plan, the result of which was an exchange of like kind properties, the transaction comes within the ambit of section 1031. *Bell Lines, Inc. v. United States*, 480 F.2d 710, 713–714 (4th Cir. 1973); *Crenshaw v. United States*, 450 F.2d 472, 475–476 (5th Cir. 1971), cert. denied 408 U.S. 923 (1972); *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 658 (5th Cir. 1968); *Century Electric Co. v. Commissioner*, 192 F.2d at 159. Having carefully reviewed the evidence in the case before us, we are convinced that the transfer of the Maryland property and receipt of the Virginia property were part of an

integrated plan intended to effectuate an exchange of like kind properties, the substantive result of which was an exchange within the meaning of section 1031.

At the outset, it is clear that the parties intended and agreed that there would be an exchange of properties. From the beginning of the negotiations between the petitioner and Mr. Powell, the petitioner insisted that as part of the consideration for the transfer of his Maryland property, he receive like kind property in exchange. *Alderson v. Commissioner*, 317 F.2d at 792–793. Mr. Powell orally agreed to an exchange of properties, and Mr. Porter, after confirming that such an agreement in fact existed, advised the petitioner that he could begin looking for suitable property to be received in exchange. The petitioner located the Virginia property and negotiated for the sale of such property. *Coastal Terminals, Inc. v. United States*, 320 F.2d at 338; *Alderson v. Commissioner, supra.* For reasons not disclosed in the record, Mr. Powell, at that time, was either unable or unwilling to enter into the contract to purchase the Virginia property or to take title to it. Accordingly, the petitioner made the contract of sale to him "acting as agent for syndicate" and thereafter arranged to have the title transferred to Shore. *Coupe v. Commissioner*, 52 T.C. at 407. Mr. Powell subsequently contracted to purchase the Virginia property from Shore. The February 27, 1969, contract of sale between the petitioner and Mr. Powell was a written formalization of their prior agreement to exchange properties: the petitioner agreed to convey his Maryland property to Mr. Powell, and as part of the consideration for the Maryland property, Mr. Powell assigned his right to purchase the Virginia property to the petitioner. The exchange agreement was consummated at the May 26, 1969, closing, at which time the petitioner conveyed title to the Maryland property to Mr. Powell's assignees and received title to the Virginia property.

This Court previously had occasion to consider a markedly similar transaction in the case of *Coupe v. Commissioner, supra.* *Coupe* dealt with a transaction involving four parties: (1) The taxpayer, who wished to exchange properties; (2) a prospective purchaser of the taxpayer's property, who did not own the property the taxpayer wished to receive in exchange; (3) a prospective seller of the property the taxpayer wished to receive in exchange; and (4) a fourth party. The taxpayer transferred

his property to the fourth party, who sold it to the prospective purchaser for cash. With such cash, the fourth party purchased the property the taxpayer wished to receive in exchange and transferred it to the taxpayer. The Court held that the transaction constituted an exchange within the meaning of section 1031. 52 T.C. at 406. In *Coupe*, as in the case before us, the prospective purchaser of the taxpayer's property was either unable or unwilling to obtain title to the exchange property. 52 T.C. at 407. However, that factor was not determinative; the Court found that the statute requires only that, as the end result of an agreement, property is received as consideration for property transferred by the taxpayer. 52 T.C. at 409. Accordingly, there is no merit in the Commissioner's argument that the transaction before us cannot qualify under section 1031 because Mr. Powell, the Lessans, and Ocean View never received legal title to the Virginia property. See also *W. D. Haden Co. v. Commissioner*, 165 F.2d at 590; but see *Carlton v. United States*, 385 F.2d 238, 242–243 (5th Cir. 1967).

Moreover, the fact that the petitioner advanced funds to Shore to enable it to purchase the Virginia property is not fatal to his case. Similar arguments were advanced in the case of *124 Front Street, Inc. v. Commissioner, supra*. In that case, the taxpayer owned an option to acquire property that Firemen's wished to own. Firemen's agreed to advance funds to the taxpayer so that it could exercise its option and then sell or exchange the option property with Firemen's. The Court rejected the Commissioner's argument that the taxpayer had sold its option to Firemen's. Instead, the Court held that the transaction represented a valid exchange of properties under section 1031. 65 T.C. at 15. The Court further held that the funds advanced by Firemen's to the taxpayer represented a loan, and not boot received by the taxpayer on the exchange. 65 T.C. at 18.

In the case before us, the petitioner helped to finance Shore's acquisition of the Virginia property: he paid an earnest money deposit of $13,900 at the time the contracts of sale were signed and subsequently advanced $115,655.14 to Shore to enable it to close the contracts, for a total of $129,555.14. Although the petitioner received $900,000 when the exchange agreement was closed ($100,000 in cash and an $800,000 promissory note), $129,555.14 of such amount in fact represented repayment of loans previously made by the petitioner to Shore. Cf. *124 Front*

*Street, Inc. v. Commissioner, supra.* In addition, the Virginia property which the petitioner received was subject to mortgages in the total amount of $142,544.86, which the petitioner assumed; thus, part of the cash he received at the closing was to reimburse him for the assumption of such mortgages. In substance, the petitioner exchanged his Maryland property for the Virginia property and $627,900 in cash or its equivalent.

We recognize that there are factual differences between the case before us and other cases dealing with three- and four-party exchanges. For example, in *Coupe v. Commissioner, supra,* the Court found as a fact that the fourth party was acting as the agent of the purchaser of the taxpayer's property, rather than as the taxpayer's agent. 52 T.C. at 406–407. We have made no such finding with respect to Shore's role here. Moreover, in *Coupe,* because of the form in which the transaction was cast, the taxpayer never handled the cash used to acquire the exchange property. 52 T.C. at 409. However, in substance, the transaction in the case before us is not materially different from that in *Coupe v. Commissioner.*

In *Coupe,* although the Court found that the fourth party was not the agent of the taxpayer, the fourth party undertook, at the request of the taxpayer, to arrange, for the benefit of the taxpayer, an exchange of property that would qualify under section 1031. In the case before us, Shore assumed a similar role. In contracting to purchase the Virginia property, the petitioner made clear that he was acting, not for himself, but on behalf of Mr. Powell. When it developed that Mr. Powell was unable or unwilling to take title to the Virginia property, Shore accepted title to facilitate an exchange. Thus, in both *Coupe* and the case before us, the fourth party was used to facilitate an exchange, and the taxpayer never acquired legal title to the property before the exchange.

Nor do the financial arrangements in the case before us differ significantly. If Shore had borrowed money from another person to finance its acquisition of the Virginia property, and if at the closing Ocean View had paid Shore the funds to pay off such loan and discharge the mortgages, the petitioner would have received, at the closing, the Virginia property and $627,900 in cash. Certainly such a transaction would qualify as a section 1031 exchange under the rule of *Coupe.* In the case before us, although the formal structure of the transaction is different, the

net result is the same. To reach a different result in the case before us, merely because the transaction was not so artfully arranged, would be to exalt form over substance.

Such an emphasis on the form in which the transaction is cast has been the object of criticism among commentators[5] and has led an appellate court to observe that the cases in this area are " 'hopelessly conflicting.' " *Bell Lines, Inc. v. United States*, 480 F.2d at 714. Moreover, undue reliance on the form of these transaction frustrates the legislative purpose, that is, to defer recognition of gain or loss in instances in which the taxpayer continues his investment in property of a like kind. Undue reliance on form also produces capricious results; in cases which are not substantively different, courts are led to reach differing results. On the other hand, if we focus instead on the substance of the transactions, taking into consideration all steps which are part of an integrated plan, we reach results which are consonant with the legislative purpose and which treat all taxpayers evenhandedly. Traditionally, the courts have been guided by substance, not form, in deciding tax controversies (e.g., *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465 (1935); *Weiss v. Stearn*, 265 U.S. 242 (1924)), and such principle must be applied in deciding the case before us.

The Commissioner argued that under the rule enunciated in *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we are bound to follow the decision of the Court of Appeals for the Fifth Circuit in *Carlton v. United States*, 385 F.2d 238 (1967). In *Carlton*, the taxpayers, who had given an option on their ranch property, negotiated to acquire other ranch property which they wished to receive in a tax-free exchange. The optionee contracted to buy the other property but never acquired title to such property. Instead, the optionee paid cash for the taxpayers' property and assigned to the taxpayers its contractual right to acquire the other property. Two days later, the taxpayers purchased the other property, using the money

---

[5] R. West & H. Chodorow, "New Case Points up Planning Techniques in Tax-Free Exchanges of Real Estate," 20 J. Taxation 52, 55 n. 18 (1964); R. Winokur, "Real Estate Exchanges: The Three-Corner Deal," 28th Ann. N.Y.U. Inst. on Fed. Taxation 127, 142–143 (1970); see especially Comment, "Section 1031 Exchanges: Step Transaction Analysis and the Need for Legislative Amendment," 24 U.C.L.A. L. Rev. 351 (1976).

previously received from the optionee to close the transaction. The court found that the transaction constituted a sale by the taxpayers and a purchase of other property. 385 F.2d at 242. The court distinguished an earlier decision, *W. D. Haden Co. v. Commissioner, supra*, pointing out that the money received by the taxpayers was not earmarked to be used in purchasing the exchange property; thus, the taxpayers had unrestricted use of the money received. 385 F.2d at 243.

Clearly, the court in *Carlton* was troubled by the harshness of the result it reached. 385 F.2d at 243. In a subsequent case, *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652 (5th Cir. 1968), the court distinguished *Carlton*. In *Redwing*, there was a sale of old property and an acquisition of new property; but, since the court found that the sale and acquisition were interdependent, it treated them as merely steps in a single transaction, which constituted an exchange under section 1031. The court distinguished *Carlton* on the basis that in *Carlton* there was no similar finding of interdependence of steps in the purported exchange. 399 F.2d at 659.

The facts in the case before us are significantly different from those in *Carlton*. In *Carlton*, the taxpayers conveyed their property for cash and 2 days later reinvested the proceeds; here, the transfer of the Maryland property and receipt of the Virginia property occurred simultaneously. Moreover, the petitioner already had committed funds to the purchase of the Virginia property; thus his use of the cash received was not unfettered or unrestricted, as was found in *Carlton*. Here, we have found that the events were merely steps designed to effect an exchange, and under these circumstances, we are satisfied that our decision is not inconsistent with the holdings of the Fifth Circuit in *Carlton* and *Redwing*. Cf. *Kent v. Commissioner*, 61 T.C. 133, 137–138 (1973).

To reflect concessions by the parties and to give effect to our opinion herein,

*Decision will be entered under Rule 155.*