BONNY B. MALONEY AND ROBERT S. MALONEY,
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

BONNY B. MALONEY AND ROBERT S. MALONEY,
TRANSFEREES OF ASSETS OF MALONEY VAN &
FURNITURE STORAGE, INC., PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 41612-84, 1716-85.          Filed July 25, 1989.

*John A. Stassi, II,* and *June Y. Bass,* for the petitioners in docket No. 41612-84.

*Charles B. Johnson,* for the petitioners in docket No. 1716-85.

*Deborah R. Jaffe,* for the respondent.

CHABOT, *Judge:* Respondent determined deficiencies in Federal individual income tax and additions to tax under

section 6653(a)[1] (negligence, etc.) against petitioners (in docket No. 41612-84) as follows:

| Taxable year | Deficiency | | Additions to tax sec. 6653(a) |
|---|---|---|---|
| 1978 | $39,977 | | $1,998.85 |
| 1979 | 321,883 | | 16,094.15 |

Respondent also determined that each petitioner (in docket No. 1716-85) is liable as a transferee of the assets of Maloney Van & Furniture Storage, Inc. (hereinafter sometimes referred to as Van) for a deficiency in Federal corporate income tax for 1978 in the amount of $115,418.03. These cases have been consolidated for trial, briefs, and opinion. After concessions by both sides in docket No. 41612-84, the issue for decision that controls both dockets is whether a particular exchange of real estate qualifies for nonrecognition under section 1031.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petitions were filed in the instant cases, petitioners Bonny B. Maloney, and Robert S. Maloney (hereinafter sometimes referred to as Maloney), wife and husband, resided in New Orleans, Louisiana.

Van, a Louisiana corporation, was a calendar year taxpayer. Van was formed in 1966, and its initial business activity, as its name suggests, was the moving and storing of furniture. Sometime in 1977, Van discontinued the active conduct of that business; thereafter, its only activity until its dissolution was the leasing of its assets to related corporations. From the time Van was formed until December 12, 1978, petitioners owned 80 percent of Van's stock and Olga Maloney (hereinafter sometimes referred to as Olga) owned the remaining 20 percent. Olga was Maloney's stepmother. Maloney's father died in 1978. On December

---

[1]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.

[2]In docket No. 41612-84, the adjustments to medical expense deductions are derivative, and depend on the settled issues and on our determination as to the sec. 1031 issue; petitioners have conceded negligence for 1978 and respondent has conceded it for 1979.

12, 1978, Maloney acquired the remaining 20 percent of the stock in Van from Olga in exchange for his $125,000 nonnegotiable, noninterest-bearing promissory note. The note was payable in installments over 20 years, beginning January 1, 1984. From then until Van's dissolution, petitioners owned all of Van's stock.

Maloney also had an interest in a number of other corporations, including Maloney Trucking & Storage, Inc., and Gallagher Transfer & Storage (hereinafter sometimes collectively referred to as the Maloney interests).

One of Van's primary assets was a piece of real estate (hereinafter sometimes referred to as the I-10 property) located in Jefferson Parish, in or near Metairie, near Cleary Avenue, and extending to the I-10 service road. This is northwest of downtown New Orleans, just outside the New Orleans city limits. Van bought the I-10 property on or about August 15, 1971. At the same time, Van bought land adjoining the I-10 property on the western side. Van's intention at that time was to build a warehouse on this adjoining property and to hold the I-10 property for investment or development. Van built the warehouse on this adjoining property and held the I-10 property for investment.

In mid-1978, Maloney indicated to his attorney, Charles B. Johnson (hereinafter sometimes referred to as Johnson), that there was a possible purchaser for the I-10 property. Maloney also mentioned to Johnson that the Maloney interests were considering acquiring a piece of property on Elysian Fields Avenue in New Orleans (that property is hereinafter sometimes referred to as Elysian Fields). Elysian Fields is northeast of downtown New Orleans. Johnson advised Maloney that a like-kind exchange would produce more favorable tax results than a taxable sale or exchange. As of August 2, 1978, Maloney intended to consolidate the different businesses with which he was associated. He also intended that operations of the Maloney interests be located on Elysian Fields. Neither Van nor Maloney intended to sell Elysian Fields.

On August 2, 1978, Van entered into an exchange agreement (hereinafter sometimes referred to as the exchange agreement) with James Goldsmith and Edward

Hernandez (hereinafter sometimes collectively referred to as Goldsmith and Hernandez). Under the exchange agreement, Van agreed to transfer the I-10 property to Goldsmith and Hernandez. In exchange, Goldsmith and Hernandez were to convey to Van property referred to in the exchange agreement as "the exchange property", which was intended to be Elysian Fields. The I-10 property and Elysian Fields are properties of a like kind.

The exchange described in the exchange agreement was subject to several conditions. Firstly, Goldsmith and Hernandez did not yet own Elysian Fields, so they were to enter into an agreement to buy Elysian Fields under terms acceptable to Van. Secondly, Goldsmith and Hernandez would have to obtain valid and merchantable title to Elysian Fields, and Van would have to provide valid and merchantable title to the I-10 property. If Goldsmith and Hernandez were unable to acquire valid and merchantable title to Elysian Fields (first condition, above) or were unable to enter into an agreement to purchase Elysian Fields on terms acceptable to Van, then Van would nevertheless be obligated to sell the I-10 property to Goldsmith and Hernandez for cash. Thirdly, the exchange was conditioned on Goldsmith and Hernandez' obtaining a zoning change on the property adjacent to the I-10 property.[3]

On October 15, 1978, Goldsmith and Hernandez entered into an agreement to buy Elysian Fields from Robert Coffin (hereinafter sometimes referred to as Coffin). Coffin did not at that time own Elysian Fields; on August 8, 1978, Coffin had entered into an agreement to buy Elysian Fields from Hibernia National Bank in New Orleans (hereinafter sometimes referred to as Hibernia). The agreement between Coffin and Hibernia was conditioned on certain zoning changes being made. On October 12, 1978, the Council of the City of New Orleans approved the rezoning upon which the agreement between Coffin and Hibernia was conditioned. The Comprehensive Zoning Ordinance of the City of New Orleans was amended accordingly on April 19, 1979. On November 29, 1978, the Jefferson Parish Council ap-

---

[3]The exchange agreement provided a requirement for rezoning of the I-10 property. About 2 months later, the exchange agreement was amended to replace that requirement with a requirement for rezoning of certain property immediately to the east of the I-10 property.

proved the rezoning of the property adjacent to the I-10 property, as contemplated in the exchange agreement; the rezoning became effective on December 11, 1978.

In early December, Maloney advised Johnson that there was a possible purchaser for the property adjoining the I-10 property on its western side. Johnson began to consider the possibility of liquidating Van. Shortly thereafter, Johnson and Maloney discussed the possibility of liquidating Van. Maloney reacted favorably. Johnson recommended that Maloney take certain steps before liquidating Van. Firstly, Johnson recommended that Maloney acquire Olga's Van stock. Maloney bought Olga's Van stock on December 12, 1978, as discussed *supra.* Secondly, Johnson recommended that Maloney contribute additional capital to Van. On December 28, 1978, Maloney borrowed $400,000 and contributed it to Van. The cash so contributed was used in part to provide the $374,112 that Van was to pay to Goldsmith and Hernandez on the exchange.

Maloney made his decision to liquidate Van in mid-December of 1978, within a few days of his discussions with Johnson.

On December 28, 1978, the following also occurred: (1) Hibernia transferred Elysian Fields to Coffin; (2) Coffin transferred Elysian Fields to Goldsmith and Hernandez; and (3) Goldsmith and Hernandez transferred Elysian Fields to Van, and in return Van transferred the I-10 property plus $374,112 in cash to Goldsmith and Hernandez.

Van realized gain on the exchange in the amount of $371,144.57.[4]

Soon after Van acquired Elysian Fields, a local funeral home sought to buy Elysian Fields from Van, but Van would not sell the property.

On January 2, 1979, Van's directors (i.e., petitioners and Olga) adopted a plan to liquidate Van under section 333, and on January 3, 1979, Van's shareholders (i.e., petitioners) approved that plan. As of January 26, 1979, Van was completely liquidated in full compliance with the requirements of section 333, and on that date, all of Van's assets were distributed to petitioners. The fair market values of

---

[4]The notices of transferee liability show the gain as $371,144.07. The notice of deficiency shows the gain as $371,144. Our finding is in accordance with the parties' stipulation.

the assets transferred from Van to petitioners on Van's liquidation were as shown in Table 1.

Table 1

| Asset | Amount |
| --- | --- |
| Land-Elysian Fields ........................ | $900,000.00 |
| Land-Metairie............................. | 200,084.00 |
| Building-Metairie.......................... | 137,416.00 |
| Accounts receivable ....................... | 91.90 |
| Cash...................................... | 2,219.97 |
| Total .................................. | 1,239,811.87 |

The aggregate value of these assets exceeded Van's income tax liability as determined in the notices of transferee liability issued to petitioners.

On Van's liquidation, petitioners assumed Van's liabilities in the amount of $228,347.15. Petitioners' basis in their Van stock as of the time of Van's liquidation was $529,000.

As previously stated, Van realized gain on the exchange in the amount of $371,144.57. Petitioners realized gain on the liquidation in the amount of $482,464.72, computed as follows:

| | |
| --- | --- |
| Property received ......................... | $1,239,811.87 |
| Less: liabilities assumed ................... | −228,347.15 |
| Balance................................... | 1,011,464.72 |
| Less: basis in stock........................ | −529,000.00 |
| Realized gain.............................. | 482,464.72 |

After petitioners acquired Elysian Fields, they leased it to Gallagher Transfer & Storage for a term of about 25 or 30 years. Gallagher Transfer & Storage constructed a building on Elysian Fields and uses about 60 percent of the land for its own purposes and subleases about 40 percent to others for parking of cars and trucks. At the end of the lease term, the building constructed by Gallagher Transfer & Storage is to revert to petitioners.

---

When Van received Elysian Fields in exchange for the I-10 property and cash, it was intended that Van liquidate and distribute Elysian Fields to petitioners and that Elysian Fields be held for investment. It was not intended that

Elysian Fields be sold, or used for personal purposes, or transferred by way of gift.

OPINION

Respondent contends that the exchange of the I-10 property for Elysian Fields does not qualify for nonrecognition under section 1031(a) because Van did not hold Elysian Fields for productive use in trade or business or for investment; rather, Van intended to distribute Elysian Fields to its shareholders (petitioners) under section 333.[5] Respondent concedes that, if Van had not been liquidated but everything else (including the later use of Elysian Fields) had taken place as it did, then the exchange would have resulted in nonrecognition of gain under section 1031(a).

Petitioners maintain that an intent to liquidate under section 333 does not necessarily cause a transaction to fail the "holding" requirement of section 1031. They contend that they did not intend to cash out their investment in the property received, and that they therefore qualify for nonrecognition under section 1031.

We agree with petitioners that the exchange qualifies under section 1031.

If (a) Elysian Fields and the I-10 property are of like kind, (b) before the exchange Van held the I-10 property for investment, and (c) after the exchange Van held Elysian Fields for investment, then under section 1031(a)[6] Van does

---

[5]The parties agree that if we decide that the exchange did not qualify under sec. 1031, then: (1) Van has additional income for 1978 in the amount of $371,144.57 (see n. 4, *supra* and accompanying text), and a deficiency in Federal corporate income tax in the amount of $115,418.03; (2) petitioners, as transferees of Van's assets (within the meaning of sec. 6901(a)(1)(A)) are liable for Van's entire deficiency as determined in the notices of transferee liability; (3) Van has additional earnings and profits as of Jan. 26, 1979, in the amount of $371,144.57; and (4) under sec. 333(e), petitioners' recognized gain on Van's liquidation is increased by the amount of $371,144.57.

In order for property to qualify for like-kind exchange treatment, the property must be held either for productive use in trade or business or for investment. However, business property may be exchanged for investment property and vice versa. Sec. 1031(a), sec. 1.1031(a)-1(a), Income Tax Regs. Accordingly, the distinction between "trade or business" and "investment" is immaterial for our purposes; for convenience, we will use the term "held for investment".

[6]SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or

not recognize any gain on its exchange of the I-10 property for Elysian Fields.[7]

The purpose of section 1031 (and its predecessors) is to defer recognition of gain or loss on transactions in which, although in theory the taxpayer may have realized a gain or loss, the taxpayer's economic situation is in substance the same after, as it was before, the transaction. Stated otherwise, if the taxpayer's money continues to be invested in the same kind of property, gain or loss should not be recognized. H. Rept. 73-704 (to accompany H.R. 7835, the Revenue Act of 1934) p. 13 (1934), 1939-1 C.B. (Part 2) 554, 564; *Biggs v. Commissioner,* 69 T.C. 905, 913 (1978), affd. 632 F.2d 1171 (5th Cir. 1980).

Section 333[8] recognizes a taxpayer's continuing investment in the property received (here, real estate), without the interposition of a corporate form. *Bolker v. Commissioner,*

---

evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

[The subsequent amendments of this provision by sec. 77 of the Deficit Reduction Act of 1984 (Pub. L. 98-369, 98 Stat. 494, 595) and by sec. 1805(d) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2810) do not apply to the instant cases. The provision now appears as paragraphs (1) and (2) of sec. 1031(a).]

[7]If cash or other property which does not qualify as like-kind property is included in the exchange, then gain is recognized to the extent of the cash or other property received. Sec. 1031(b); *Wagensen v. Commissioner,* 74 T.C. 653, 657 (1980). In the instant cases, Van paid cash but did not receive cash, and the parties agree that Elysian Fields and the I-10 property are of like kind.

[8]Sec. 333 provides, in pertinent part, as follows:

SEC. 333. ELECTION AS TO RECOGNITION OF GAIN IN CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—In the case of property distributed in complete liquidation of a domestic corporation * * *, if—

(1) the liquidation is made in pursuance of a plan of liquidation adopted, and

(2) the distribution is in complete cancellation or redemption of all the stock, and the transfer of all the property under the liquidation occurs within some one calendar month,

then in the case of each qualified electing shareholder (as defined in subsection (c)) gain on the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subsections (e) and (f).

* * * * * * *

(e) NONCORPORATE SHAREHOLDERS.—In the case of a qualified electing shareholder other than a corporation—

(1) there shall be recognized, and treated as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, such earnings and profits to be determined as of the close of the month in which the transfer in liquidation occurred under subsection (a)(2), but without diminution by reason of distributions made during such month; but by including in the computation thereof all amounts accrued up to the date on which the transfer of all the property under the liquidation is completed; * * *

[The subsequent repeal of sec. 333 by sec. 631(e)(3) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2273, does not affect the instant cases.]

81 T.C. 782, 805 (1983), affd. 760 F.2d 1039 (9th Cir. 1985). The taxpayer's basis in the property received in a section 333 liquidation is equal to the basis in the stock surrendered, and the gain is not recognized, but is deferred until the investment is cashed out. At that point, the gain is taxed. *Id.*

In *Magneson v. Commissioner,* 81 T.C. 767 (1983), affd. 753 F.2d 1490 (9th Cir. 1985), the taxpayers exchanged property A for like-kind property B, after which the taxpayers contributed property B to a limited partnership. The contribution of property B was nontaxable under section 721. We held that the contribution of property B to the partnership was not a liquidation of the taxpayers' investment, but rather was a continuation of the old investment unliquidated in a modified form. 81 T.C. at 771.

In passing, we note that the term "liquidation" is often used in this context as equivalent to a disposition that "cashes out" the investment. This is the sense that is described as follows in H. Rept. 73-704 (to accompany H.R. 7835, the Revenue Act of 1934) p. 13 (1934), 1939-1 C.B. (Part 2) 554, 564:

The calculation of the profit or loss is deferred until it is realized in cash, marketable securities, or other property not of the same kind [as the property disposed of] having a fair market value.

This is different from "liquidation" under section 333, where the corporation's shareholders are to receive the exchanged-for property, and not cash. Thus, in *Regals Realty Co. v. Commissioner,* 43 B.T.A. 194 (1940), affd. 127 F.2d 931 (2nd Cir. 1942), discussed *infra,* the first holding that section 1031 did not apply was based on the taxpayer's intent to liquidate, in the sense of selling the property for cash, and not based on their intent to liquidate the corporation. In *Bolker v. Commissioner,* 81 T.C. 782 (1983), affd. 760 F.2d 1039 (9th Cir. 1985), the corporation was liquidated, but the property was received in kind by the taxpayer; there we held that section 1031 granted nonrecognition.

In *Bolker v. Commissioner, supra,* we dealt with the interplay of sections 1031 and 333. There, the taxpayer caused his corporation to liquidate under section 333; he

then transferred to an unrelated person the property he received in the liquidation, in exchange for property of like kind, and claimed that the exchange was tax-free under section 1031. We concluded, in effect, that the taxpayer is treated as having had the same purpose for holding the property as the taxpayer's corporation had before the section 333 liquidation, as follows (81 T.C. at 805-806):

We believe *Magneson* entitles petitioner to relief herein. In both *Magneson* and the instant case, property A was exchanged for property B in a like-kind exchange, both properties being held for business or investment as opposed to personal purposes. In *Magneson,* the exchange of A for B was immediately followed by a tax-free section 721 transfer; in the instant case, the exchange of A for B was immediately preceded by a tax-free acquisition under section 333. That the tax-free transaction preceded rather than followed the exchange is insufficient to produce opposite results. For, as noted, section 1031's holding for business or investment requirement is reciprocal, equally applicable to properties at both ends of an exchange. Nothing in the policy underlying section 1031 suggests that this minor variation in sequence warrants treating taxpayers dramatically different.

Even aside from *Magneson,* we believe petitioner is correct. A trade of property A for property B, both of like kind, may be preceded by a tax-free acquisition of property A at the front end, or succeeded by a tax-free transfer of property B at the back end. Considering first the tax-free acquisition of property A through a section 333 liquidation at the front end, it is appropriate to ask why gain is deferred on a liquidation. In short, where a taxpayer surrenders stock in his corporation for real estate owned by the corporation, he continues to have an economic interest in essentially the same investment, although there has been a change in the form of ownership. His basis in the real estate acquired on liquidation is equal to his basis in the stock surrendered, and the gain realized is not recognized but deferred until gain on the continuing investment is realized through a liquidating distribution. At that point, proceeds of the sale are taxed to the extent of the gain.

Section 333 recognizes the taxpayer's continuing investment in the real estate without the interposition of a corporate form. If property A is traded for like-kind property B for business or investment purposes, the taxpayer has not cashed out his venture, and gain or loss should not be recognized. Section 1031 is designed to apply to these circumstances and to defer recognition of gain or loss where the "taxpayer has not really 'cashed in' on the theoretical gain, or closed out a losing venture." *Jordan Marsh Co. v. Commissioner,* 269 F.2d 453, 456 (2d Cir. 1959), revg. a Memorandum Opinion of this Court, quoting *Portland Oil Co. v. Commissioner,* 109 F.2d 479, 488 (1st Cir. 1940). Accordingly, we hold that the exchange of the Montebello property qualifies for nonrecognition treatment under section 1031.

The instant cases may be viewed as a variant of *Magneson* (exchange of like-kind properties followed by a tax-free change in form of ownership) or as a variant of *Bolker* (interplay of sections 333 and 1031). In either view, petitioners have satisfied the requirements of section 1031.

Van's purpose was the purpose of petitioners, Van's owners. The acquired property, Elysian Fields, was not liquidated in the sense of being cashed out (as in *Regals Realty Co. v. Commissioner*, 43 B.T.A. 194 (1940), affd. 127 F.2d 931 (2nd Cir. 1942)); it was not transferred as a gift (as were the residences in *Click v. Commissioner*, 78 T.C. 225 (1982)). Rather, Elysian Fields continued to be held for investment by Van's owners.

The exchange before us reflects both continuity of ownership and of investment intent. Before the exchange, Van owned the I-10 property. After the exchange, Van owned Elysian Fields. Both before and after the exchange, petitioners owned all of Van's stock. After the section 333 liquidation, petitioners owned Elysian Fields directly, without the interposition of the corporate form. Petitioners continued to have an economic interest in essentially the same investment, although there was a change in the form of ownership. *Bolker v. Commissioner*, 81 T.C. at 805. Petitioners at all relevant times intended to continue to use Elysian Fields for investment. Petitioners had Van enter into the exchange because petitioners intended to operate some of their other businesses on Elysian Fields.

If Van had not been liquidated and had used Elysian Fields precisely as its shareholders did, then clearly the exchange would have been nontaxable under section 1031; so respondent concedes. As we understand *Magneson* and *Bolker*, the mere addition of another nontaxable transaction (at least, a transaction exempted by section 721 or 333) does not automatically destroy the nontaxable status of the transaction under section 1031.

On the authority of *Magneson* and *Bolker*, we conclude that Van's exchange of the I-10 property plus cash, in return for Elysian Fields, is tax-free as to Van under section 1031.

On brief, respondent states that "the evidence in [the instant cases] establishes that Van, an inactive corporation,

did not initiate any attempts to acquire the Elysian Fields property, and was not going to use the Elysian Fields property in a trade or business." If we were to accept this view of the situation, and if Van had liquidated before the exchange, then the instant cases would be on all fours with *Bolker*. It seems, given respondent's view of the facts, that respondent's basic quarrel with what was done in the instant cases is solely as to the order in which the exchange and the liquidation took place. We have already stated plainly our position on that point in *Bolker v. Commissioner*, 81 T.C. at 805, set forth *supra*. Thus, respondent's analysis merely strengthens petitioners' position in the instant cases.

Respondent states as his view that "the intent to liquidate and to distribute property to shareholders is akin to an intent to sell the property or to gift it." We disagree. This has already been decided adversely to respondent. *Bolker v. Commissioner, supra*.

On brief, respondent directs our attention to the Court of Appeals' opinion in *Bolker v. Commissioner*, 760 F.2d at 1045, in which that court states that "a taxpayer may satisfy * * * the 'for productive use in trade or business or for investment' requirement by lack of intent either to liquidate the investment or to use it for personal pursuits." Respondent then states as follows:

At the time of the exchange, Van intended to liquidate and upon liquidation to distribute all of its property, including the property received in the exchange to its shareholders. Van would then cease to exist. It is incomprehensible that such an intent could be viewed as not being an intent to liquidate its investment. Liquidating its investment is in fact clearly what Van intended to do, and did do.

Respondent appears to have confused two senses of "liquidate". Van did not intend to liquidate Elysian Fields in the sense of receiving for it "cash, marketable securities, or other property not of the same kind having a fair market value." See discussion of this point, *supra;* see also *Zuanich v. Commissioner*, 77 T.C. 428, 443 n. 26 (1981), regarding "utraquistic subterfuge". The section 333 liquidation was held not to be a cashing out liquidation in *Bolker*, and we conclude that it is not a cashing out liquidation in the instant cases.

Respondent cites *Regals Realty Co. v. Commissioner*, 43 B.T.A. at 211, as support for his contention that section 1031 does not allow the property received to be liquidated to the recipient-corporation's shareholder.

In *Regals Realty*, shortly after the exchange there in issue, the taxpayer decided "to liquidate * * * promptly, and in connection therewith *to sell the real estate which had just been received and to distribute the proceeds of that sale* to complete the liquidation." 43 B.T.A. at 209, emphasis supplied. For one or more reasons, the property was not sold for cash. Instead, in the next year, the property was contributed to a newly-formed corporation in exchange for the newly-formed corporation's stock, and that stock was distributed to the taxpayer's shareholders in the taxpayer's liquidation. 43 B.T.A. 204-205. We held that, at the time of the exchange, the taxpayer intended to sell the received property for cash and not to hold the property "for productive use in trade or business or for investment", as the statute requires. Accordingly, we held that the exchange was not tax-free and the taxpayer would have to recognize its gain. 43 B.T.A. at 209-210. See also *Regals Realty Co. v. Commissioner*, 127 F.2d at 933-934.

After so holding, the Board added the following (43 B.T.A. at 210-211):

Petitioner contends further that the intention should be gauged by what was actually done rather than by the expression of that intent. We are not persuaded that this is correct. But, assuming we were to do so, the result would be the same. For the action actually taken was to dispose of the property to another corporation controlled by the same interests. It may be true that this transaction was in the nature of a tax-free reorganization. Nevertheless it was a transfer from this petitioner and made it impossible for it to "hold" the property as an investment. We think the provisions of 112(b)(1) [the predecessor of sec. 1031] were intended to apply only to the same taxpayer. We are not required to disregard the separate corporate entities of petitioner and its successor at the behest of their creators. *Higgins v. Smith*, 308 U.S. 473 [1940].

This alternative holding was relied on in *Vim Securities Corp. v. Commissioner*, 43 B.T.A. 759, 769 (1941), affd. 130 F.2d 106 (2nd Cir. 1942), which involved nonrecognition under section 112(f) of the Revenue Act of 1936 (the predecessor of section 1033), and which accordingly is not

dispositive of the instant cases. This point is explained in *Magneson v. Commissioner,* 81 T.C. at 772. The alternative holding of *Regals Realty* was distinguished in *United States v. Brager Building & Land Corp.,* 124 F. 2d 349, 351 (4th Cir. 1941). The Circuit Court of Appeals for the Second Circuit affirmed the Board in *Regals Realty* without mention of this alternative holding. Although we have relied on the basic holding of *Regals Realty* in a number of cases, e.g., *Bolker v. Commissioner,* 81 T.C. at 805; *Magneson v. Commissioner,* 81 T.C. at 781; *Click v. Commissioner,* 78 T.C. at 231; *Wagensen v. Commissioner,* 74 T.C. at 659, we have not found any case involving sections 333 and 1031 which has relied on, or even mentioned the alternative holding of *Regals Realty.*

We need not decide in the instant cases whether we agree with the *Regals Realty* alternative holding that a section 351 transaction would be incompatible with a section 1031 tax-free exchange. Compare *Magneson v. Commissioner,* 81 T.C. at 773 n. 5, with *Magneson v. Commissioner,* 753 F.2d at 1493. We have already held that section 721 and section 333 transactions are not incompatible with section 1031 tax-free exchanges.

We conclude that (1) *Regals Realty*'s basic holding is consistent with our holding in the instant cases, and (2) *Regals Realty*'s alternative holding is distinguishable.

Respondent also contends that, from petitioners' perspective, the exchange, in substance, constitutes an exchange of stock for property, which is expressly excluded from the nonrecognition provisions of section 1031(a). The exchange in issue was between Van, on the one hand, and Goldsmith and Hernandez, on the other. Van received only real estate in the exchange. (Van paid $374,112 to Goldsmith and Hernandez, which is boot, and presumably taxable to Goldsmith and Hernandez under section 1031(b); however, Goldsmith and Hernandez are not before us.) Even if petitioners transferred stock to Van in the course of the section 333 liquidation, the like-kind exchange was, from Van's (as well as from petitioners') viewpoint, both in form and in substance, an exchange of real estate.

We hold for petitioners. As a result, (1) Van does not have an income tax deficiency and so petitioners do not

have a transferee liability, and (2) Van does not have increased earnings and profits and so petitioners do not have to recognize increased gain on Van's liquidation.

To reflect petitioners' concessions in docket No. 41612-84,

> *Decision will be entered under Rule 155 in docket No. 41612-84, and decision will be entered for the petitioners in docket No. 1716-85.*