**MASTER EAGLE ASSOCIATES, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 74 Civ. 827(MEL).

United States District Court, S. D. New York.

Jan. 7, 1981.

LeFrak, Fischer, Myerson & Mandell, New York City, for plaintiff; Gerald D. Fischer, Joseph S. LeFrak, Michael A. Zimmerman, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, for defendant; Janis Far-

rell, Twila L. Perry, Asst. U. S. Attys., New York City, of counsel.

LASKER, District Judge.

Master Eagle Associates, Inc. ("Master Eagle") sues to recover a tax refund of $21,605.06 plus interest allegedly overpaid by its predecessor corporation, Edison Photo Engraving Co., Inc. ("Edison"), to the Internal Revenue Service.

## I.

Edison was a closely held corporation engaged in the business of photoengraving. Prior to November 1965, it was owned by four individual shareholders who each held 25 shares of the 100 shares of outstanding authorized capital stock.[1] For varying reasons each of the stockholders decided either that he wished to discontinue his association with Edison or to carry on its business in a new form, preferably by merging with another company. Two of the shareholders, Joseph Tashjian and Martin Tashjian, wished to continue in the business, but recognized that Edison's equipment and plant had become outmoded and that they had insufficient capital to purchase the needed additional equipment and to move to larger premises (T. 14–18).[2] One partner, Paul Chaputian, wanted to leave the photoengraving business and then devote himself full time to his restaurant business (T. 21–23, 67, 69). The fourth partner, Dickran Hazrijian, wanted to exchange his night shift for day work, an arrangement Edison was unable to accommodate because of the need to have a supervisor present at night (T. 24–25, 69).

Beginning in 1960, Edison's shareholders sought a company with a more modern plant and equipment which was willing to merge with Edison. Those efforts were unsuccessful (T. 18–21). In September 1965, negotiations began with Master Eagle's principals which culminated in the transaction in question on November 20, 1965.

These negotiations were initiated by Paul Chaputian who conducted the first discussions with Mario Gambacini and Andrew Shahinian, two principals of Master Eagle (T. 42). Shahinian also had discussions with Joseph Tashjian and Martin Tashjian separately concerning what employment arrangement they and Dickran Hazrijian wanted with Master Eagle (T. 42, 61, 68, 70). A final meeting (before the November 20th meeting) was held between the four Edison shareholders and the four principals of Master Eagle (T. 52).

During those negotiations, the subject of how to structure the transaction was not discussed, though Edison's shareholders were active in determining the price of the sale and the terms of their individual employment arrangements with Master Eagle (T. 43, 47–48, 52–53, 67–70).

On November 20, 1965, Edison's fixed assets and 100 shares of its stock were sold to Master Eagle and the four Edison shareholders sold their interests in Edison (according to the plan described below) and received a total of $140,000. The transaction was effected in several steps. First, one hundred shares of Edison's treasury stock was sold to Master Eagle for $40,000. (Minutes of a Special Meeting of the Stockholders and Directors of Edison Photo Engraving Co., Inc. PX 14, p. 2 November 20, 1965). Second, Edison's plant and equipment and the $40,000. just paid by Master Eagle were distributed to the four shareholders in exchange for their 100 shares of outstanding Edison stock (Stock Redemption Agreement, PX 1). Finally, the former shareholders of Edison sold the plant and equipment to Master Eagle for $100,000. (Bills of Sale, PX 2, 3). Thus, at the conclusion of this series of transactions, the four shareholders had transferred their stock in Edison, and received $140,000. Master Eagle acquired the stock, plant and equipment of Edison and paid $140,000. (see Testimony of Dr. George H. Sorter, government's economics expert, T. 143–46).

1. An additional 100 shares of authorized capital stock of Edison was in Edison's treasury at the time.

2. Numbers preceded by "T," refer to page numbers of the trial transcript.

Master Eagle contends that the stock redemption by Edison is a distribution of assets to shareholders non-taxable under 26 U.S.C. § 311(a). That section provides that "no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of . . . property." The United States contends that the transaction was in substance a taxable sale of assets by Edison, and not by the shareholders, to Master Eagle; and that the intervening stock redemption and sale of assets by the shareholders were shams with no other purpose than to avoid tax liability.

## II.

Two Supreme Court decisions have articulated the factors which determine whether a sale of assets is to be regarded for tax purposes as having been made by the shareholders, and consequently not taxable to the corporation, or by the corporation, and therefore taxable to it. In *Commissioner v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), the stock of a corporation whose sole asset was an apartment house was exclusively owned by Minnie Miller and her husband. The corporation negotiated with the building's lessees for its sale, culminating in an oral agreement. The corporation deeded the building to the Millers in return for all their stock (which was all of the outstanding stock), and the property was then sold by the Millers.

The Tax Court held that the sale was by the corporation and that the corporation was therefore taxable on the gain realized. The Supreme Court agreed.

"The Tax Court concluded from these facts that, despite the declaration of the 'liquidating dividend' followed by the transfers of legal title, the corporation had not abandoned the sales negotiations; that these were mere formalities designed 'to make the transaction appear to be other than it was' in order to avoid tax liability. . . .

"There was evidence to support the findings of the Tax Court, and its findings must therefore be accepted by the

courts. . . . On the basis of these findings, the Tax Court was justified in attributing the gain from the sale to respondent corporation. The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."

*Id.* at 333–34, 65 S.Ct. at 708 (citations and footnote omitted).

*Court Holding* was distinguished in *United States v. Cumberland Public Service Co.*, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950). There, a closely held corporation offered to sell its stock to a cooperative. The cooperative refused to buy the stock but agreed to buy the equipment owned by the corporation. The corporation transferred its equipment to its shareholders in partial liquidation, then sold its remaining assets and dissolved. The shareholders sold the equipment to the cooperative. The Court of Claims found that the deal was structured to avoid tax liability, that the corporation had genuinely dissolved, and that the sale was made by the shareholders and not by the corporation. The Supreme Court again agreed with the conclusion of the finder of fact: this time, that the corporation was *not* liable for tax on the sale of the equipment. The Court stated that its opinion in *Court Holding*

"does not mean that a corporation can be taxed even when the sale has been made by its stockholders following a genuine liquidation and dissolution. While the distinction between sales by a corporation

as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. The corporate tax is thus aimed primarily at the profits of a going concern. This is true despite the fact that gains realized from corporate sales are taxed, perhaps to prevent tax evasions, even where the cash proceeds are at once distributed in liquidation. But Congress has imposed no tax on liquidating distributions in kind or on dissolution, whatever may be the motive for such liquidation. Consequently, a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation."

*Id.* at 454–55, 70 S.Ct. at 281–82 (footnotes omitted).

### III.

The determinative issue here is whether the sale of Edison's assets was by the corporation or its shareholders. Such a determination is not always obvious in the context of a closely held corporation where the actions of the shareholders and those of the corporation are not readily distinguishable. *See Cumberland, supra,* 338 U.S. at 454–55, 70 S.Ct. at 281–82. Nevertheless, having considered the factors established as controlling by the Supreme Court in *Court Holding* and *Cumberland,* we conclude that in substance the sale here was by Edison's shareholders.

The evidence establishes, and we find, that the transaction with Master Eagle was negotiated by the Edison shareholders and not by the corporation. Witnesses who participated in those negotiations testified that the subjects of discussion were what each of the Edison shareholders independently required from Master Eagle (T. 43, 52, 59, 67–70, 75–76). There was no testimony or other evidence showing that some corporate object or benefit either prompted the negotiations or was discussed or sought to be secured during them.[3]

That the transaction here was negotiated at all times by the shareholders and not by Edison distinguishes this case from *Court Holding,* in which the finding that the transaction was by the corporation was based in large part on the fact that the negotiations there had been initially conducted on behalf of the corporation, and had never been abandoned by the corporation. 324 U.S. at 333, 65 S.Ct. at 708. *See Waltham Netoco Theatres, Inc. v. Commissioner,* 401 F.2d 333, 335 (1st Cir. 1968) (transaction negotiated on behalf of corporation was "on the corporate rather than on stockholder level").

Another factor significant in determining the issue here is whether, after the transaction was completed, Edison continued as a "going concern" or was liquidated and dissolved. As the Supreme Court noted in *Cumberland,* the corporate tax is "aimed primarily at the profits of a going concern." 338 U.S. at 455, 70 S.Ct. at 282. In *Cumberland,* the corporation dissolved after the sale of the assets remaining after the distribution to the shareholders, and indeed, the Court noted that *Court Holding* did not apply to a case in which there had been a "genuine liquidation and dissolution." *Id.* at 453, 454, 70 S.Ct. at 281, 282 (footnote omitted).[4]

---

**3.** The government contends that the negotiations were carried out on behalf of Edison as evidenced by the fact that Lester Schwartz, Edison's attorney, also represented three of the shareholders (the fourth, Paul Chaputian, retained his own counsel). However, that Schwartz represented them during the November 20th meeting (T. 43–44) does not alter the more significant fact that the talks leading up to the final meeting were carried out by the shareholders themselves.

**4.** It should be noted that it has been held that a liquidation of the corporation is not essential to a finding that the sale was by the shareholders rather than the corporation. In *Hines v. United States,* 477 F.2d 1063, 1068 (5th Cir. 1973), which presented an issue similar to the one here, the court rejected the government's argument that the sale should be imputed to the corporation because the transfer to the shareholders was made by an ongoing concern in anticipation of a sale by the shareholders in order to avoid tax liability. The consideration

It is true that in the case at hand Edison was not dissolved after the November 20, 1965 transaction. Indeed, it continued formally to exist until 1973. However, although there was no "genuine liquidation and dissolution" following the transaction, neither is it appropriate to characterize Edison as having been a "going concern" following November 20, 1965. Andrew Shahinian, Treasurer and one fourth owner of Master Eagle in 1965, testified as follows:

"Q Now, on and after November 20, 1965, was Edison as a corporation kept in existence?

"A Yes, for two or three years.

"Q Why is that?

"A Because there is a certain amount of good will, if you will, that went with the name, the background, the organization, and it is something that we didn't just want to buy and drop and get rid of immediately.

"What we did is over a period of two or three years, we decreased the name of Edison and the work would come in and go out under the name Master Eagle, and the accounts learned the name Master Eagle, and Edison was just liquidated."

(T. 71). Shahinian further testified that the equipment purchased from Edison's shareholders was moved to Master Eagle's premises (T. 74). Edison's employees were either hired by Master Eagle or discharged (T. 75). In sum, after the transaction, Edison existed in name only and no longer operated as an independent corporation. It was gradually phased out of existence so that Master Eagle, whose primary purpose in entering the transaction was to acquire Edison's customers (T. 79), could reap the advantage of Edison's name.

The government argues that Master Eagle failed to meet its burden of showing a valid business purpose for structuring the transaction as a stock redemption and sale of assets by the shareholders and that the real purpose was solely to avoid tax liability. Moreover, the government's expert witness, Dr. George H. Sorter, testifies that none of the individual steps in the transaction made "economic sense" alone, and were not "economically rational" unless viewed together as a whole transaction (T. 143–46).[5]

However, this contention fails to address the crucial issue here. The Supreme Court made clear in *Cumberland* that the purpose of structuring a transaction to avoid tax liability does not alter the tax consequences of that transaction:

"The subsidiary finding that a major motive of the shareholders was to reduce taxes does not bar this conclusion. Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes."

338 U.S. at 455, 70 S.Ct. at 282. Thus, as *Court Holding* made explicit, "the transaction must be viewed as a whole," 324 U.S. at 334, 65 S.Ct. at 708, and the issue here is not what the purpose of the transaction's structure was, but rather the purpose of the transaction as a whole. That purpose was to satisfy the independent needs of each of Edison's shareholders.

We conclude that Edison is not liable for tax on a gain realized on the sale of assets and that plaintiff is accordingly entitled to a refund of the tax paid.

This opinion constitutes the court's findings of facts and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Submit judgment on notice.

---

deemed more relevant by the court was whether "the corporation actively participated in the transaction that produced the income ... by negotiation, prior agreement, postdistribution activities, or ... in any other significant manner." *Id.* at 1069–70.

5. There was some testimony indicating that the deal was structured in this manner to avail Edison shareholders of installment tax benefits (T. 77–78; testimony of Joseph S. Lefrak, attorney for Master Eagle, on November 20, 1965, pp. 2–3). Since, as discussed in the text below, the reason for structuring the transaction this way is irrelevant to the outcome, we make no finding on this issue.