JOSEPH R. BOLKER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7100–77, 8379–78.[1]   Filed October 20, 1983.

---

[1]These cases were ordered consolidated for purposes of trial, briefing, and opinion.

*Douglas W. Argue, Gilbert Dreyfuss,* and *Philip Karpel,* for the petitioner.

*Arthur A. Oshiro,* for the respondent.

WILBUR, *Judge:* Respondent has determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner | Taxable year ended | Deficiency |
|---|---|---|---|
| 7100-77 | Joseph R. Bolker | 12/31/72 | $1,714,973 |
| 7100-77 | Jospeh R. Bolker | 12/31/73 | 9,747 |
| 8379-78 | Joseph R. Bolker, transferee | 3/28/72 | 896,919 |

These consolidated cases present the following issues for our decision:

(1) Whether petitioner's exchange of the Montebello property should be imputed to petitioner's wholly owned corporation; and

(2) Whether the exchange of the Montebello property qualifies for nonrecognition treatment under section 1031.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Joseph R. Bolker (hereinafter referred to as petitioner or Joseph) resided in Los Angeles, Calif., at the time he filed his petitions in these consolidated cases.

During the period from 1956–67, Joseph built 4,000 to 5,000 single family residential homes in the southern California area. Petitioner conducted his business primarily through numerous corporate entities which he created to acquire title to the land, to develop the sites either as improvement

---

[2] All section references are to the Internal Revenue Code of 1954 as in effect during the taxable years in issue, unless otherwise indicated.

contractors or building contractors, to sell the finished units, and to maintain the tracts. None of the real estate development Joseph engaged in prior to 1972 was carried on in his own name. All of these corporate activities were consolidated, however, under the trade name "Brighton-Bilt Homes."

In 1960, Joseph, through his corporations, acquired approximately 170 acres of land located in Montebello, Calif. Title to 53 acres (hereinafter referred to as the Montebello property) of the 170 acres was acquired by Crosby Estates, Inc. (Crosby), a corporation at the time owned 50 percent by Joseph and 50 percent by Joseph's wife, Janice A. Bolker. Crosby had been incorporated under the laws of California on December 2, 1954.

Original plans called for the construction of single-family homes on all of the Montebello property except 14 acres which would be used to build apartments. By 1961, Joseph had decided to pursue a course of building apartments on all 53 acres. However, despite numerous efforts from 1961 through 1967, Joseph was unsuccessful in having the land rezoned to accommodate multifamily housing.

On April 26, 1967, Joseph's wife, Janice A. Bolker, filed a complaint for divorce against the petitioner in the Superior Court of the State of California for the County of Los Angeles. One of the main issues in the divorce proceeding was the division of the community property, of which the Crosby stock, and thereby the Montebello acreage, was a major asset. During the pendency of the divorce action, petitioner's corporations were, due to a restraining order issued by the Superior Court, allowed only to complete existing projects and were barred from further developing any of the community property.

On May 27, 1969, Crosby granted an option to Southern California Savings & Loan Association (SCS) to purchase the Montebello property for $2,030,000.[3] SCS timely notified Crosby that it was exercising the option and placed a $100,000 deposit into escrow. SCS failed, however, to deposit the balance of the purchase price into escrow by the closing date. Accord-

---

[3]During all of 1969, Crosby held legal title to the Montebello property, and the sale contemplated would have been between Crosby and SCS. Since Janice at that time owned one-half of the Crosby stock, her approval of the option grant was required and was received from her attorneys.

ingly, on September 12, 1969, Crosby notified SCS that it considered the contract breached and that under the terms of the agreement it demanded that the $100,000 deposit be paid over in satisfaction of the seller's claim for damages.

There was no further contact between Crosby, Joseph, or their representatives and SCS until April 1970, at which time Mr. Kenneth Childs, president of SCS, was called to testify at the Bolkers' divorce hearing. Childs told the court that SCS might still be interested in acquiring the Montebello property under certain conditions for $2,030,000. The Bolkers had previously stipulated that, for purposes of the divorce proceedings, the value of the property was $1,750,000. The presiding judge thereupon called counsel into chambers and said that an opportunity to sell the property should not be overlooked and strongly suggested that the possibility be explored with SCS.

A meeting was held that same day between Richard Dreyfus (hereafter Richard), general counsel for SCS, and Glenn Watson and Gilbert Dreyfuss (hereafter Gilbert), two of petitioner's attorneys.[4] Richard informed them that SCS indeed believed the property to be worth $2,030,000, but that SCS was not interested in the property for its own investment but, rather, for one of SCS's clients, Frank Arciero. Joseph's lawyers inquired whether SCS might be willing to enter into a joint venture arrangement. Richard responded that since Arciero had originally brought the situation to SCS's attention, SCS could not consider a venture with any other builder unless Arciero was no longer interested in the property and would sign a release from liability.

Also discussed at that meeting was Joseph's potential lawsuit against SCS for breach of the May 27, 1969, option agreement. Richard felt that the outcome of such a suit would depend in large part upon the appraisal value of the property. He expressed SCS's view that it had a viable defense of frustration of purpose due to SCS's inability to come to terms with Arciero, which Joseph was aware was a condition precedent to SCS's willingness to purchase the property. As a

---

[4]Glen Watson, Gilbert Dreyfuss, and Richard Richards are all members of the law firm of Richards, Watson, Dreyfuss & Gershon. This firm has represented Joseph Bolker on a continuing basis throughout the time period involved here, including the handling of his divorce action. The firm also was retained by Bolker to represent Crosby in many of its business dealings, including Crosby's lawsuit against SCS, mentioned *infra* at 790.

result of this meeting, Watson reported back to the divorce court that although SCS was not ready at that time to enter into an unconditional transaction, SCS was expressing interest and the matter would be discussed further.

On April 2, 1970, Richard informed Watson that Arciero was indeed still interested in the property, but that Childs had agreed that SCS would be willing to purchase the Montebello property without waiting to reach a joint venture agreement with Arciero. SCS decided it was worth the risk of being able to work out a deal with Arciero subsequent to a commitment to acquire the property upon an evaluation that the land was worth $2,030,000 and that SCS would always be able to locate another interested builder.

On April 8, 1970, Watson again suggested the possibility of a joint venture to Richard. Richard repeated his earlier position that SCS could not enter into a joint venture with Joseph until Arciero indicated he was no longer interested.

During a meeting on April 10, 1970, Joseph's attorneys suggested another version of a joint venture arrangement for the development of the property. The proposal called for Joseph to contribute one-half of the land value and to construct the improvements, while SCS would contribute the other half of the land value and would finance all construction and development costs. Childs responded that Arciero insisted on being involved in any deal. Joseph's lawyers thereupon suggested Arciero be responsible for the planning, supervision, and sale of the development (in return for a management fee) and also do the actual construction work on the "R-1" portion of the property.

On April 15, 1970, Richard advised Watson that Arciero did not want to be restricted to building only on the "R-1" portion of the property and also that Arciero wanted a share of the profit. Taking these demands into account, SCS could only afford to become involved if more interest were charged or if SCS's share of profits was substantially increased over the 50 percent previously agreed upon. Watson responded later in the day that it appeared no venture could be worked out on mutually satisfactory terms, but that Joseph was still willing to sell the property to SCS for $2,030,000 cash plus 1 year's interest at 8½ percent on the $2,030,000 purchase price from September 12, 1969.

On April 20, 1970, SCS formally rejected Joseph's offer and counteroffered to purchase the land for the same $2,030,000, but without the additional 1 year's interest. On May 11, 1970, Joseph informed SCS that he no longer wished to sell the property because (1) he desired to become active in construction again and this was the best project for him to carry on, and (2) he didn't want to have to pay a substantial sum to Janice at the time, but preferred to have her wait for her money.

Since any outright sale or joint venture arrangement had now been ruled out, Richard suggested that a third alternative should be sought. Richard thereupon noted that he had recommended to Childs that SCS consider making a permanent takeout loan to Joseph on the property. Joseph expressed enthusiasm for such a possibility, and Dreyfus agreed to pursue it further with Childs and to contact them if SCS would be willing to make the loan.

On May 14, 1970, Richard advised Joseph's attorneys that SCS would make a $2 million package of construction and conventional takeout loans available for the R–1 portion of the Montebello property. At Joseph's request, on May 20, 1970, SCS extended their April 20, 1970, counteroffer until June 12, 1970. On June 12, 1970, Gilbert informed SCS that since a final judgment in the divorce case was still about 3 weeks away, Joseph was not in a position to either accept SCS's counteroffer or negotiate the loan package. SCS proceeded to withdraw both offers, but indicated that if and when judgment was entered in the divorce action giving Joseph title to the property, SCS would entertain negotiations along the same lines if their cash flow situation at the time permitted.

On July 14, 1970, Joseph submitted an offer to SCS to sell the Montebello property for $2,030,000, plus one-half of the interest on the purchase price at 7 percent per annum due for the 1–year delay in closing, with closing to take place in September 1970. Richard responded that SCS was still willing to purchase the property or to make the loan, but funds would not be available for either purpose until sometime in 1971. Gilbert then advised SCS that Joseph was interested in working out a trade of properties, and inquired whether SCS or its holding company owned any commercial, rental, or income-producing property. Richard promised to investigate

SCS's portfolio and determine if it held such property of a sufficient value.

On July 15, 1970, Richard telephoned Gilbert and advised him SCS would not accept Joseph's offer of the previous day, but would purchase the property for a total of $2,030,000, with a March 1971 closing date. Gilbert stated he was certain his client would reject the offer and that SCS was effectively buying a lawsuit. Richard replied that Joseph was free to file a lawsuit but that was SCS's final position on the matter.

At no time during the 1970 talks did SCS assert any right to acquire the property under the 1969 contract.

On September 11, 1970, a final judgment of dissolution of marriage was entered in the Bolkers' divorce case. The Superior Court entered a "Findings of Fact and Conclusions of Law" on September 4, 1970, setting forth the divisions to be made in the community assets. Joseph was assigned, as his sole and separate property, all of the Crosby stock. To facilitate this decision, Crosby was to redeem Janice's entire stock interest in exchange for a promissory note in the principal amount of $875,000 (one-half of the stipulated value of $1,750,000) secured by a first deed of trust covering all of the Montebello property. Crosby's cause of action against SCS for failure to complete the purchase of the Montebello property in 1969 was also assigned to Joseph as his sole and separate property.

Following his divorce, Joseph came to the conclusion that he should undertake business arrangements with less inherent risk. To this end, petitioner determined that he should either develop Montebello into income-producing property by constructing apartments thereon or trade the Montebello property for other income-producing property. Joseph decided that he would build the apartment project. From September of 1970 to the end of 1971, Joseph made no effort to sell or exchange the land.

Petitioner consulted his attorneys around this time as to the tax consequences of his proposed undertaking. The lawyers advised Joseph that while the apartments were new, there would be an excess of deductions over income, and that it would be advantageous to take the property out of Crosby in order to utilize the excess deductions to reduce his individual income tax liability. They reviewed Crosby's balance sheet and

earnings and profits records, concluding that the redemption of Janice's stock had eliminated all accumulated earnings and profits. Joseph was therefore advised that he could remove the property from Crosby without incurring any income tax liability by arranging for a liquidation under section 333 of the Internal Revenue Code. Following his attorney's recommendations, Joseph decided to liquidate Crosby under section 333 as soon as proper zoning could be obtained.

Following extensive efforts commencing on December 11, 1970, to obtain a zoning change from R–1 (single-family residential) to R–3 (multifamily residential), the planning commission on May 3, 1971, finally recommended approval of the proposed zoning change to the city council of the city of Montebello. As a precondition to· obtaining zoning approval, however, Crosby was required to develop a 7–acre, 40–lot "buffer-zone" of single-family housing between the proposed apartment development and existing single-family homes. Forty-six acres thus remained for apartment construction. On October 17, 1971, Crosby sold the 7 acres to Brighton International Development Corp. (Brighton), another corporation wholly owned by petitioner, for the purpose of Brighton developing a single-family residential subdivision on the property. Crosby reported the gain on the sale as ordinary income on its Federal income tax return for its taxable year ending October 31, 1971.

In late October of 1971, Crosby had a tentative tract map and a hillside development plan prepared which showed the layout of the proposed apartment development. On November 1, 1971, the planning commission recommended approval, and on December 13 and December 27, 1971, the city council of Montebello adopted resolutions approving the tentative map and hillside development plans.

During 1970 and 1971, petitioner met and corresponded with various lending institutions in an effort to obtain financing for the proposed apartment development. These efforts met with no success.

From July 1970 until late 1971, there was no contact between Joseph and SCS. However, Joseph realized that SCS might be a potential source of financing his apartment project, and thus decided to resume negotiations with SCS. Petitioner also felt that his potential claim for breach of contract

represented his greatest leverage in dealing with SCS. Since it was feared that the statute of limitations soon might run on the claim, a "Complaint for Damages for Breach of Contract" was filed by Crosby on October 13, 1971, against SCS, based on its failure to purchase the Montebello property in 1969.

On December 20, 1971, Gilbert met with Childs and Peter McAndrews (who had replaced Richard Dreyfus as general counsel for SCS) to discuss various possible ways of settling the lawsuit. Gilbert indicated that, based on two appraisals on the property of $1,300,000 and $1,400,000, the divorce suit stipulation of a value of $1,750,000, and a contract price of $2,030,000, he felt he could show damages of $300,000 to $800,000. Gilbert proposed that SCS, in order to resolve the lawsuit, should purchase the property for $2,750,000, or for a lesser sum with petitioner taking a 25-percent interest in the future development of the property. No agreement was reached at that meeting.

During the ensuing days, petitioner and SCS conducted settlement negotiations in respect of Crosby's lawsuit. SCS refused to finance the proposed apartment project or to participate in it on a joint venture basis. SCS never asserted during the course of these talks that SCS had any right to purchase the property under the 1969 agreement.

On February 16, 1972, SCS agreed to purchase the Montebello property for $2,550,000. SCS also agreed to assume any liability to the broker who handled the 1969 aborted sale. As part of the bargain, it was agreed that Crosby's breach of contract suit against SCS would be dismissed. The lawsuit was withdrawn 2 years later.

A memorandum prepared by McAndrews for the SCS files concerning the February 16, 1972, agreement includes the following item:

SoCal [SCS] shall furnish to Dreyfuss [counsel] for both Crosby and petitioner] sample exchange property escrow instructions, since it is Dreyfuss' intent to liquidate Crosby Estates for tax reasons. In other words, Boelker, [sic] individually will be the seller in the transaction.

Between March 8, 1972, and March 28, 1972, the dissolution and liquidation of Crosby was commenced and completed pursuant to section 333 of the Internal Revenue Code and under State law. On March 8, 1972, the board of directors of Crosby adopted a plan for the complete liquidation and

dissolution of Crosby within the terms of section 333 of the Internal Revenue Code. On the same day, petitioner, as sole shareholder of Crosby, executed a written consent to the voluntary dissolution of the corporation.

Also on March 8, 1972, Parlex, Inc. (Parlex), was incorporated under the laws of California by Gilbert Dreyfuss, Glenn R. Watson, and Richard Richards, all members of the law firm of Richards, Watson, Dreyfuss & Gershon. Parlex was formed to satisfy a general need by the law firm to have an independent entity available to facilitate property exchanges, to act as trustee under deeds of trust, and to act as a plaintiff in collection matters, and it has so acted in many transactions since that date. However, the immediate purpose to be served by Parlex was to facilitate the transfer of the Montebello property from petitioner to SCS.

On March 9, 1972, officers of Crosby executed a "Certificate of Election to Wind Up and Dissolve." This certificate was filed with the office of the secretary of state of the State of California on either March 10, 1972, or March 13, 1972, and was filed on March 16, 1972, with the office of county clerk, corporate division, Los Angeles County.

The following events all occurred on March 13, 1972, except as otherwise indicated:

Joseph, in his capacity as president of Crosby, executed an "Assignment and Bill of Sale," which transferred all of Crosby's assets and liabilities to petitioner, its sole shareholder, in complete redemption of all of the corporation's outstanding stock.

(2) Petitioner signed IRS Form 964 signifying his election to be taxed in accordance with the provisions of section 333 (filed with respondent on March 16, 1972).

(3) Petitioner, as president of Crosby, signed IRS Form 966 advising respondent of Crosby's liquidation under the provisions of section 333 (filed with respondent on March 16, 1972).

(4) A corporation grant deed conveying the Montebello property from Crosby to petitioner, subject to Janice's deed of trust, was signed and recorded the same day.

(5) Officers of Crosby signed a document assigning to Joseph certain plans, blueprints, etc., relating to the development of the Montebello property.

(6) Parlex and petitioner entered into an "Exchange Agreement" which provided for the transfer of the Montebello property to Parlex at an agreed value of $2,550,000, subject to the deed of trust in favor of Janice having a present unpaid principal balance of $583,333, in exchange for other real property to be designated by petitioner prior to closing on May 1, 1972. Parlex was obligated to expend its best efforts towards acquiring any designated property, but to the extent that the value of the property so acquired by Parlex was less than $2,550,000, the difference was to be paid to petitioner in cash rather than in real property.[5]

(7) Parlex and SCS entered into an agreement whereby Parlex agreed to sell the Montebello property, which it was to acquire from petitioner under the "Exchange Agreement" referred to above, to SCS for $2,550,000. This contract included the following provision:

10. *Coordination with Exchange Agreement.* The close of escrow under this agreement shall be coordinated with the closing of such escrows as are required between seller [Parlex] and Bolker. Buyer [SCS] acknowledges that seller [Parlex] intends to use the proceeds of sale of the Montebello property in the purchase of the exchange property to be transferred to Bolker in exchange for the Montebello property.

(8) A "Settlement Agreement" was entered into by Crosby, petitioner, Parlex, and SCS. The agreement recited the existence of the civil complaint filed by Crosby against SCS, the election by Crosby to completely liquidate, the distribution of the Montebello property to petitioner, the "Exchange Agreement," and the agreement by Parlex to sell the property to SCS. The agreement provided for the dismissal of the lawsuit with prejudice in the event that SCS completed acquisition of the Montebello property, and for other alternative consequences should either of the parties breach the recited agreements. Petitioner signed the agreement both as president of Crosby and in his individual capacity.

---

[5] Conversely, if the "value of the exchange property" acquired by Parlex and transferred to petitioner exceeded the value of the Montebello property, petitioner would have been obligated to pay the difference to Parlex in cash. The "value of the exchange property" included not only the aggregate purchase price plus all attendant costs in acquiring the designated parcels, but also (1) the amount payable to Janice under the deed of trust, and (2) all costs and expenses incurred by Parlex in transferring title to the Montebello property to SCS.

On June 6, 1972, petitioner, in accordance with the terms of the "Exchange Agreement," designated three properties which Parlex was to acquire. Also on June 6, 1972, Parlex executed purchase agreements for each of the designated properties with their respective owners. The properties so designated and their acquisition costs were (1) unimproved real property in Riverside, Calif., for $136,000, (2) a leasehold estate in real property, a shopping center, located in Palm Springs, Calif., for $842,500, and (3) improved real property, a shopping center, in Norwalk, Calif., for $3,400,000.[6]

On June 30, 1972, the following transactions were simultaneously closed in escrow:

(1) Petitioner conveyed the Montebello property to Parlex, and Parlex, in turn, conveyed the Montebello property to SCS.

(2) Parlex acquired the three exchange properties from their respective sellers, and Parlex, in turn, conveyed these properties to the petitioner, with the exception of the leasehold estate in the Palm Springs shopping center which was conveyed to Brighton-P S Center, a partnership between petitioner and his solely owned corporation, Brighton International Development Corp.[7]

Petitioner constructed apartments on the Riverside acreage he acquired in the exchange. Development of this apartment complex was completed in 1979. SCS had the Montebello property zoning reversed and constructed single-family houses beginning in 1977.

Respondent mailed separate statutory notices of deficiency to petitioner for his 1972 and 1973 individual income tax returns, and as transferee of the assets of Crosby. Due to concessions and the decision we reach herein, we are concerned with only two adjustments:

(1) As to Crosby, for the short taxable year beginning November 1, 1972, and ending on March 28, 1972, respondent

---

[6]This purchase was financed by the buyer (Parlex) giving $900,000 cash at closing and a purchase-money note in the principal sum of $2,500,000, secured by a first deed of trust encumbering the property.

[7]It appears from the escrow statement that petitioner received a check for $61,108.47, in addition to the exchange properties.

increased the corporation's taxable income by $1,890,255, based upon the determination that Crosby had sold the Montebello property prior to the adoption of the plan of liquidation.

(2). Respondent also increased petitioner's income by $2,117,599, since he determined that the tax-free exchange under section 1031 reported on the return did not qualify as a tax-free exchange under section 1031. As a result of related concessions, the parties now agree that the proposed increase for this item is $2,475,969.

## OPINION

The first question we must consider is who made the exchange,[8] Crosby or petitioner. *Steubenville Bridge Co. v. Commissioner*, 11 T.C. 789, 798 (1948). This question is one of fact.[9] *Waltham Netoco Theatres, Inc. v. Commissioner*, 401 F.2d 333 (1st Cir. 1968), affg. 49 T.C. 399 (1968).

Crosby,· a corporation whose stock was held equally by petitioner and his wife, owned vacant land known as the Montebello property. In May 1969, Crosby granted an option to SCS to purchase the Montebello property. SCS notified Crosby that it was exercising the option, but failed to deliver the balance of the purchase price by the closing date. On September 12, 1969, Crosby notified SCS that it considered the contract to have been breached by SCS.

There was no further contact between Crosby (or petitioner) and SCS until April 1970. At that time, SCS indicated that it still might be willing to purchase the property. These negotia-

---

[8]We have denominated the transfer of the Montebello property to Parlex in return for the transfer to petitioner of the three other properties as an "exchange," and respondent does not contend otherwise. Respondent has, without total success, contended transfers of this nature are in substance sales involving the receipt of cash or other nonqualifying consideration by the transferor. See, e.g., *Biggs v. Commissioner*, 632 F.2d 1171 (5th Cir. 1980), affg. 69 T.C. 905 (1978). Although Parlex, a new corporation formed by petitioner's attorneys, received from SCS the cash needed to acquire the "exchange properties," no similar argument has been made here by respondent. In a subsequent portion of this opinion, we will consider in detail the question of whether the "exchange" qualifies for nonrecognition treatment generally under sec. 1031.

[9]As to each issue, the parties made intricate arguments as to where the burden of proof (or as they use the term "burden of persuasion") resides. Neither issue needs to be decided on the basis of the burden of proof. We have assumed, without deciding, that the party prevailing on each issue had the burden of proof on that issue.

tions terminated in July of 1970, the participants having been unable to agree on a price.

On September 11, 1970, petitioner and his wife were divorced, and Crosby redeemed Mrs. Bolker's entire stock interest in exchange for a promissory note. Since the redemption eliminated all of Crosby's accumulated earnings and profits, petitioner's attorneys advised him that he could remove the property from Crosby without incurring any Federal income tax liability by arranging a liquidation under section 333.[10] Petitioner decided to follow this advice.

From the time of his divorce until late 1971, petitioner made no effort to sell or exchange the land, and no contacts were made with SCS. Instead, he set out to have the land rezoned to multifamily residential as he intended to construct an apartment complex. After a protracted battle, petitioner finally won zoning approval, but failed in his efforts to find proper financing.

Viewing SCS, a savings and loan association, as a potential source of financing, and knowing that a breach of contract

---

[10] Sec. 333 provides in relevant part:

SEC. 333. ELECTION AS TO RECOGNITION OF GAIN IN CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—In the case of property distributed in complete liquidation of a domestic corporation (other than a collapsible corporation to which section 341(a) applies), if—

(1) the liquidation is made in pursuance of a plan of liquidation adopted on or after June 22, 1954, and

(2) the distribution is in complete cancellation or redemption of all the stock, and the transfer of all the property under the liquidation occurs within some one calendar month, then in the case of each qualified electing shareholder (as defined in subsection (c)) gain on the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subsections (e) and (f).

\* \* \* \* \* \* \*

(e) NONCORPORATE SHAREHOLDERS.—In the case of a qualified electing shareholder other than a corporation—

(1) there shall be recognized, and treated as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, such earnings and profits to be determined as of the close of the month in which the transfer in liquidation occurred under subsection (a)(2), but without diminution by reason of distributions made during such month; but by including in the computation thereof all amounts accrued up to the date on which the transfer of all the property under the liquidation is completed; and

(2) there shall be recognized, and treated as short-term or long-term capital gain, as the case may be, so much of the remainder of the gain as is not in excess of the amount by which the value of that portion of the assets received by him which consists of money, or of stock or securities acquired by the corporation after December 31, 1953, exceeds his ratable share of such earnings and profits.

against SCS arising out of the 1969 aborted sale which Crosby filed on October 13, 1971, might provide leverage towards obtaining a loan, petitioner resumed talks with SCS in December 1971. This time, a deal was struck. On February 16, 1972, an agreement in principle was reached and, as of March 8, 1972, Crosby commenced complete liquidation pursuant to section 333. On March 13, 1972, Crosby deeded the Montebello property to the petitioner. That same day, petitioner and SCS each entered into contracts which provided the terms for the agreed upon exchange with a June 6, 1972, closing date. On March 21, 1972, Crosby completed its liquidation. On June 6, 1972, the exchange took place as scheduled.

In *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), all of the outstanding stock of a corporation was owned by a husband and wife who had organized the company in 1934 for the single purpose of acquiring title to an apartment building, which was the only asset ever owned by the corporation. Sometime subsequent to October 1939, negotiations were begun with the wife for the purchase of the building. On January 5, 1940, a $1,000 deposit was received toward the purchase price. A final oral agreement as to the terms of the sale was reached, and a contract drawn up embodying the terms of the verbal commitments was presented for signature at a meeting held February 22, 1940. The contract was never executed, the corporation's attorney advising the purchaser that the corporation could not consummate the sale because it would result in the imposition of a large income tax on the corporation. The next day, the corporation declared a "liquidating dividend" which involved a complete liquidation of its assets and the surrender of all outstanding stock. The building was thereupon deeded to the shareholders. A new sales contract, embodying substantially the same terms and conditions as had been previously agreed to, but this time naming the shareholders as the sellers, was executed on February 26, 1940. The $1,000 downpayment was applied as part payment of the purchase price. Although the corporation transacted no business and owned no property after the dissolution of its assets, it was not formally dissolved prior to trial.

We held that the stockholders were merely carrying out the agreement made by the corporation and not an agreement made by themselves, particularly in view of the fact that no

further negotiations as to the terms of the sale took place between February 22 and the February 26 signing. It was our opinion that the liquidation and transfer of legal title to the shareholders "were formal devices" designed "to make the transaction appear to be other than what it was." *Court Holding Co. v. Commissioner*, 2 T.C. 531, 538 (1943). The Fifth Circuit reversed, disagreeing with our fact findings, but the Supreme Court reversed the Fifth Circuit, holding that our findings were supported by the evidence. The Supreme Court stated:

> There was evidence to support the findings of the Tax Court, and its findings must therefore be accepted by the courts. * * * On the basis of these findings, the Tax Court was justified in attributing the gain from the sale to respondent corporation. The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [*Commissioner v. Court Holding Co.*, 324 U.S. 331, 333, 334 (1945). Fn. refs. omitted.]

Five years later, the Supreme Court granted certiorari in *United States v. Cumberland Public Service Co.*, 338 U.S. 451, 453 (1950), "to clear up doubts arising out of the *Court Holding Co.* case." In *Cumberland*, the taxpayer was a closely held corporation engaged in the business of generating and distributing electric power. When it became obvious that the company could not compete with Tennessee Valley Authority power, its shareholders offered to sell all of the corporate stock to a cooperative. The cooperative refused to buy the stock, but countered with an offer to buy the corporation's transmission and distribution equipment. The corporation rejected the offer in order to avoid paying a heavy capital gains tax. The shareholders, instead, offered to acquire the transmission and distribution equipment from the corporation and then sell them to the cooperative, thereby avoiding capital gains treatment for the corporation. Upon acceptance by the cooperative, the corporation transferred the specified equipment to

its shareholders in partial liquidation. The shareholders then sold the equipment to the cooperative pursuant to the previously contemplated arrangement. The corporation meanwhile sold its remaining assets and dissolved.

The Court of Claims refused to impute the gain from the sale by the shareholders to the corporation, finding as a factual matter that the sale had been made by the shareholders. Although the deal was structured to avoid tax liability, the court found that the corporation never intended to sell the equipment and that the liquidation and dissolution genuinely ended the corporation's activities and existence. *Cumberland Public Service Co. v. United States*, 83 F. Supp. 843 (Ct. Cl. 1949), affd. 338 U.S. 451 (1950).

The Supreme Court affirmed, distinguishing its earlier opinion in *Court Holding*:

> This language [in *Court Holding*] does not mean that a corporation can be taxed even when the sale has been made by its stockholders following a genuine liquidation and dissolution. While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. The corporate tax is thus aimed primarily at the profits of a going concern. This is true despite the fact that gains realized from corporate sales are taxed, perhaps to prevent tax evasions, even where the cash proceeds are at once distributed in liquidation. But Congress has imposed no tax on liquidating distributions in kind or on dissolution, whatever may be the motive for such liquidation. Consequently, a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation.
>
> Here, on the basis of adequate subsidiary findings, the Court of Claims has found that the sale in question was made by the stockholders rather than the corporation. The Government's argument that the shareholders acted as a mere "conduit" for a sale by respondent corporation must fall before this finding. The subsidiary finding that a major motive of the shareholders was to reduce taxes does not bar this conclusion. Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes. [*United States v. Cumberland Public Service Co.*, 338 U.S. at 454–455. Fn. ref. omitted.]

Respondent argues that the instant case falls within the ambit of *Commissioner v. Court Holding Co., supra*, and that Crosby, not petitioner, should be treated as having made the exchange with Parlex. Under respondent's view of the facts,

the exchange by Joseph was merely the culmination of negotiations between Crosby and SCS, which began prior to the liquidation of Crosby, and which were never abandoned by Crosby prior to the actual exchange. Petitioner asserts, however, that Crosby was never involved in the negotiations which were handled solely on behalf of petitioner. Petitioner therefore concludes that no grounds exist for respondent's attempt to impute the gain to the corporation.

In determining whether the pattern of events fits the mold of *Commissioner v. Court Holding Co.*, *supra*, or *United States v. Cumberland Public Service Co.*, *supra*, we recognize, as did the Supreme Court, that "the distinction * * * may be particularly shadowy and artificial when the corporation is closely held." *United States v. Cumberland Public Service Co.*, 338 U.S. at 454–455. Nonetheless, having considered the factors established by the Supreme Court in *Court Holding* and *Cumberland*, we conclude that in substance as well as form, the exchange was made by Joseph.

The Supreme Court subsequently noted in *Central Tablet Manufacturing Co. v. United States*, 417 U.S. 673, 680 (1974), that its earlier decisions in *Court Holding* and *Cumberland* "created a situation where the tax consequences were dependent upon the resolution of often indistinct facts as to whether the negotiations leading to the sale had been conducted by the corporation or by the shareholders."[11] In attempting to define the level and nature of corporate involvements which must be present before any sale or exchange might be imputed to that entity, we stated in *Merkra Holding Co. v. Commissioner*, 27 T.C. 82 (1956):

It is not necessary to reconcile all of the litigated situations where it has been held the stockholders' sales after liquidation in kind were or were not attributable to the corporation. Certain it is from all of the authorities the sale cannot be attributed to the corporation unless the corporation has,

---

[11]In direct response to the confusion generated by the *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), and *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950), decisions, Congress enacted sec. 337, I.R.C. 1954, which provided that no gain or loss was to be recognized on sales or exchanges of property which occur within 12 months after the adoption of a plan of complete liquidation, even if the sale is consummated by the corporation. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, pars. 11.64–11.65, pp. 11–70, 11–77 (4th ed. 1979). However, the distinctions resulting from the *Court Holding —Cumberland* dichotomy are still relevant where, as here, the corporation has not attempted to comply with the provisions of sec. 337.

while still the owner of the property, carried on negotiations looking toward a sale of the property, and in most cases the negotiations must have culminated in some sort of sales agreement or understanding so it can be said the later transfer by the stockholders was actually pursuant to the earlier bargain struck by the corporation—and the dissolution and distribution in kind was merely a device employed to carry out the corporation's agreement or understanding. [*Merkra Holding Co. v. Commissioner, supra* at 92. Fn. ref. omitted.]

More recently, the Fifth Circuit in *Hines v. United States*, 477 F.2d 1063 (5th Cir. 1973), stated that the touchstone for determining whether the proceeds of a sale should be imputed to the corporation is whether the corporation actively participated in the sale:

the *sine qua non* of the imputed income rule is a finding that the corporation actively participated in the transaction that produced the income to be imputed. Only if the corporation in fact participated in the sale transaction, by negotiation, prior agreement, postdistribution activities, or *participated* in any other significant manner, could the corporation be charged with earning the income sought to be taxed. Any other result would unfairly charge the corporation with tax liability for a transaction in which it had no involvement or control. [477 F.2d at 1069–1070. Emphasis in original.]

Examining the record in the instant case, we find *at most* minimal corporate involvement in the negotiations and the exchange. While it is true that in 1969 Crosby entered into a sales agreement with SCS for the precise parcel in question here, that contract was terminated upon SCS's failure to make payment of the balance of the purchase price. In no way can it be said that the events of 1972 were a continuation of the transaction which was agreed upon in 1969. As representatives of both Crosby and SCS testified, both parties were of the opinion that the prior deal was dead and that the subsequent negotiations started the bargaining process anew. Cf. *Telephone Directory Advertising Co. v. United States*, 142 F. Supp. 884 (Ct. Cl. 1956). At no time later did SCS ever assert any right to acquire the property under the 1969 contract.[12] The most that could be said to have lingered from the 1969 aborted sale was the potential for litigation.

---

[12]In fact, during the negotiations between petitioner and SCS at the time of petitioner's divorce hearing, SCS claimed that it had a viable defense to a suit brought as a result of the 1969 contract.

When petitioner and SCS commenced negotiations in April 1970, there had been no contact between the two for approximately 7 months. In April 1970, the president of SCS, in testimony at the Bolkers' divorce hearing, expressed an interest in acquiring the Montebello property. Since the Montebello property represented an obstacle to dividing the community estate between petitioner and his wife, the presiding judge strongly urged Joseph to pursue any possible leads toward selling the land so that the proceeds could be simply divided. Prompted by the judge's suggestion, petitioner's attorney met with SCS representatives to discuss this matter. During the next 4 months, petitioner and SCS exchanged various offers and counteroffers regarding the sale and exchange of the property in addition to the possibility of various joint venture and financing arrangements.

After he was awarded sole interest in Crosby by the divorce court in September 1970, petitioner decided not to sell the Montebello property. Rather, he was determined to develop the Montebello property by constructing an apartment project in order to provide himself with a steady source of income. Petitioner's counsel advised him that, for tax reasons, it would be advantageous to remove the property from Crosby. Petitioner resolved to follow his lawyers' advice and liquidate as soon as zoning could be obtained. However, although petitioner obtained the proper zoning approval, his inability to obtain financing proved to be an insurmountable obstacle to his development plans. Thus, in December 1971, petitioner resumed talks with SCS in order to obtain financing from SCS, utilizing Crosby's claim for breach of contract (which the divorce court had awarded to petitioner) as leverage in obtaining a suitable loan. SCS, however, declined to finance petitioner's apartment project, but ultimately agreed to acquire the property as part of an exchange.

Thus, the evidence clearly establishes, and we find, that in substance the transaction with SCS was negotiated by petitioner and not by Crosby. In fact, the substance was entirely consistent with the form in which petitioner structured the transaction. It is true that the officials of SCS testified that it was unnecessary for SCS to make any distinction between Crosby and petitioner during the negotiations. However, petitioner was aware of the tax ramifications of such distinc-

tion and insisted that the exchange be made by himself, personally. Gilbert Dreyfuss, one of petitioner's attorneys, testified that the liquidation of Crosby under section 333 which was envisioned as early as mid-1970 was designed specifically to place the Montebello property in petitioner's hands. In fact, Gilbert directly pointed out to SCS during the negotiations that although Crosby then held title to the property, petitioner individually would be the seller of record. Furthermore, an SCS memorandum of February 16, 1972, notated by the senior vice president and general counsel of SCS (Peter McAndrews) at the time the final agreement was concluded, unequivocally states that petitioner, in his individual capacity, was to be the seller in the transaction. This is how the exchange was structured and all the voluminous documentation surrounding the deal refers to petitioner as the transferor of the Montebello property.[13]

The record is also clear that Crosby did not actively participate in the crucial events that preceded the exchange. As we indicated previously, after Crosby's unsuccessful attempt to sell the property to SCS in 1969, Crosby ceased negotiating with SCS and all subsequent negotiations with SCS with respect to the property were conducted by petitioner in his own behalf. In fact, both the consideration and terms of the exchange that petitioner and SCS ultimately agreed upon were different from that included in the 1969 contract between Crosby and SCS. Crosby's lawsuit against SCS (filed on October 13, 1971) with respect to the 1969 agreement played little, if any, role in the negotiations. Peter McAndrews testified that SCS did not consider that any portion of the payment to acquire the Montebello property was in consideration for the

---

[13]That the form of the transaction was dictated by tax considerations is immaterial. The Supreme Court made clear in *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950), that the purpose of structuring a transaction to avoid tax liability does not alter the tax consequences of that transaction. 338 U.S. at 455. In *Hines v. United States*, 477 F.2d 1063, 1069 (5th Cir. 1973), the court held that income need not be imputed even though the transfer was made "in anticipation of a sale by the shareholders, and * * * with no valid business purpose aside from motives of tax avoidance." Rather, "the transaction must be viewed as a whole" (*Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945)), and, as the District Court stated recently in *Master Eagle Associates, Inc. v. United States*, 508 F.Supp. 129, 133 (S.D. N.Y. 1981), "the issue here is not what the purpose of the transaction's structure was, but rather the purpose of the transaction as a whole." Here, as the District Court there found, the purpose of the exchange was to satisfy the independent needs of the shareholder and not that of the corporation.

dismissal of the lawsuit. Furthermore, even if part of the consideration was allocable to the release of Crosby's lawsuit, that cause of action was awarded to petitioner by the divorce court as his separate property and was received by him individually upon the complete liquidation of Crosby through the "Assignment and Bill of Sale" executed on March 13, 1972. Therefore, the negotiations involving the release of the claim for breach of contract were carried out on petitioner's behalf and not for Crosby. In sum, there is no testimony or other evidence that some corporate object or benefit either prompted the negotiations or was discussed or sought to be secured during them.

Undoubtedly, much of the confusion presented by this case arises from the dual roles played by petitioner, as sole shareholder and president of Crosby, and by petitioner's attorneys who represented both Crosby and petitioner, and respondent makes much of this fact. Yet, we cannot allow this identity of interest to become determinative of the issue and thereby presume that all such dealings are negotiated by shareholders on behalf of their corporations, particularly where there is overwhelming evidence to the contrary.[14]

Having determined that the exchange of properties was made by petitioner, we turn to the question of whether this exchange as carried out qualifies for the nonrecognition treatment accorded by section 1031.[15]

In general, section 1031 provides that no gain or loss is recognized if property held for productive use in the trade or business or for investment (excluding property held primarily for sale and certain other types of properties not involved herein) is exchanged solely[16] for property of a like kind to be

---

[14]Cf. *Cherry v. United States*, 264 F.Supp. 969, 975 (C.D. Cal. 1967).

[15]SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

[16]If cash or other property which does not qualify as like-kind property (boot) is received in an exchange, the recipient must recognize any gain realized on the transaction to the extent of the cash and the fair market value of the other property (sec. 1031(b)). Parlex paid Joseph

held either for productive use in the trade or business or for investment. Respondent argues that the exchange fails to qualify under section 1031 because the Montebello property, *at the time petitioner parted with it*, was not held by petitioner for the productive use in his trade or business or for investment. See Rev. Rul. 77–337, 1977–2 C.B. 305. We disagree with respondent.

To qualify for nonrecognition under section 1031, *both* the property transferred and the property received must be held by the taxpayer either for productive use in a trade or business or for investment. Sec. 1.1031(a)-1(a), Income Tax Regs.; *Click v. Commissioner*, 78 T.C. 225, 230 (1982); *Brauer v. Commissioner*, 74 T.C. 1134, 1139–1140 (1980). A taxpayer's intent to hold property for productive use in a trade or business or investment must be determined as of the time of the exchange. *Click v. Commissioner, supra* at 231.

We today ruled on a very similar issue in *Magneson v. Commisioner*, 81 T.C. 767 (1983) (Court reviewed). In *Magneson*, petitioners traded property A for property B, immediately contributing property B to a partnership for a 10-percent interest. Petitioners began with an interest in real property A, ending up with an interest in a partnership that had a fractional interest in real property B. Since section 721 admittedly applied when property B was transferred to the partnership, the only question we confronted was whether the exchange of property A for property B was nontaxable under section 1031.

We recognized that under section 1031, *both* properties A and B were required to be held for investment purposes. Since property A had clearly been held for investment purposes within the meaning of section 1031, we focused on property B, stating the issue as follows: "petitioners held [property B] for making a nontaxable contribution to [the partnership]; hence we must decide whether such 'holding' qualifies for holding as

---

$61,108.47 in cash and satisfied a deed of trust on the Montebello property, in favor of Janice, having a present unpaid principal balance of $583,333. Although sec. 1031(d) expressly provides that assumption of the taxpayer's liabilities by the other party to the exchange, or the acquisition of property by the other party subject to a liability, shall be considered as money received by the taxpayer on the exchange (see *Allen v. Commissioner*, 10 T.C. 413 (1948)), this case has been presented on an all or none basis and does not involve an issue of partial recognition.

an investment." Noting that petitioners did not hold property B for sale, personal use, or for transfer as a gift (see *Click v. Commissioner*, 78 T.C. 225 (1982); *Wagensen v. Commissioner*, 74 T.C. 653 (1980); *Regals Realty Co. v. Commissioner*, 43 B.T.A. 194 (1940), affd. 127 F.2d 931 (2d Cir. 1942)), we concluded that the holding of property B for a nontaxable contribution to a partnership under section 721 qualified as a holding for investment purposes under section 1031.

We believe *Magneson* entitles petitioner to relief herein. In both *Magneson* and the instant case, property A was exchanged for property B in a like-kind exchange, both properties being held for business or investment as opposed to personal purposes. In *Magneson*, the exchange of A for B was immediately followed by a tax-free section 721 transfer; in the instant case, the exchange of A for B was immediately preceded by a tax-free acquisition under section 333. That the tax-free transaction preceded rather than followed the exchange is insufficient to produce opposite results. For, as noted, section 1031's holding for business or investment requirement is reciprocal, equally applicable to properties at both ends of an exchange. Nothing in the policy underlying section 1031 suggests that this minor variation in sequence warrants treating taxpayers dramatically different.

Even aside from *Magneson*, we believe petitioner is correct. A trade of property A for property B, both of like kind, may be preceded by a tax-free acquisition of property A at the front end, or succeeded by a tax-free transfer of property B at the back end. Considering first the tax-free acquisition of property A through a section 333 liquidation at the front end, it is appropriate to ask why gain is deferred on a liquidation. In short, where a taxpayer surrenders stock in his corporation for real estate owned by the corporation, he continues to have an economic interest in essentially the same investment, although there has been a change in the form of ownership. His basis in the real estate acquired on liquidation is equal to his basis in the stock surrendered, and the gain realized is not recognized but deferred until gain on the continuing investment is realized through a liquidating distribution. At that point, proceeds of the sale are taxed to the extent of the gain.

Section 333 recognizes the taxpayer's continuing investment in the real estate without the interposition of a corporate form.

If property A is traded for like-kind property B, and the taxpayer continues to hold B for business or investment purposes, the taxpayer has not cashed out his venture, and gain or loss should not be recognized. Section 1031 is designed to apply to these circumstances and to defer recognition of gain or loss where the "taxpayer has not really 'cashed in' on the theoretical gain, or closed out a losing venture." *Jordan Marsh Co. v. Commissioner,* 269 F.2d 453, 456 (2d Cir. 1959), revg. a Memorandum Opinion of this Court, quoting *Portland Oil Co. v. Commissioner,* 109 F.2d 479, 488 (1st Cir. 1940). Accordingly, we hold that the exchange of the Montebello property qualifies for nonrecognition treatment under section 1031.

*Decisions will be entered under Rule 155.*